WALTER G. FILER, Respondent, v. CREOLE SYNDICATE, Appellant.

(Argued April 8, 1931; decided May 12, 1931.)

*John W. Davis, Fulton J. Redman* and *George W. Van Slyck* for appellant. There was no conversion or false

348

representation on the part of the defendant corporation and if the plaintiff has any cause of action it is against the syndicate managers. (*Industrial & General Trust, Ltd.*, v. *Tod*, 170 N. Y. 233; *Ward* v. *Powers*, 208 App. Div. 684; 239 N. Y. 565; *Barrowcliffe* v. *Cummins*, 66 Hun, 1.)

*Joseph M. Proskauer, Arnold L. Davis* and *J. Alvin Van Bergh* for respondent. There was conversion by reason of the receipt of the plaintiff's stock by the corporation upon a definite condition that it was to be a part of a pool made up by similar contributions and its sale two years later in absolute disregard of that condition. (*Kilmer* v. *Hutton*, 131 App. Div. 626; *Laverty* v. *Snethen*, 68 N. Y. 522; *Boyce* v. *Brockway*, 31 N. Y. 490; *MacDonnell* v. *Buffalo L., T. & S. D. Co.*, 193 N. Y. 92; *Kittredge* v. *Grannis*, 244 N. Y. 176; *Industrial & General Trust, Ltd.*, v. *Tod*, 170 N. Y. 233; *Ward* v. *Powers*, 208 App. Div. 684; *Cayuga Nat. Bank* v. *Daniels*, 47 N. Y. 631; *Bank of Rochester* v. *Jones*, 4 N. Y. 497.) There was conversion by reason of the receipt of the plaintiff's stock by the corporation with knowledge that it had been secured by trickery and false representation and its sale two years later with knowledge thereof. (*Woodworth* v. *Kissam*, 15 Johns. 172; *Precker* v. *London*, 36 Misc. Rep. 197; *Ultramares Co.* v. *Touche*, 255 N. Y. 170; *Burrowes* v. *Lock*, 10 Ves. 470; *Doyle* v. *Chatham & Phenix Nat. Bank*, 253 N. Y. 369; *Bloomquist* v. *Farson*, 222 N. Y. 381; *Taylor* v. *Commercial Bank*, 174 N. Y. 181.) There was conversion by retention and sale two years later with knowledge that the consideration for plaintiff's transfer had wholly failed. (*Dennerlein* v. *Martin*, 247 N. Y. 145; *Sokoloff* v. *National City Bank*, 239 N. Y. 158; 250 N. Y. 69.)

O'BRIEN, J. Clarence K. McCornick, John A. Drake and three others, in addition to plaintiff Walter G.

Filer, constituted a syndicate of promoters whose purpose was to acquire whatever interest a Mr. Roman held in certain oil lands in South America and, with that end in view, they organized defendant as a Delaware corporation. McCornick became its president and plaintiff one of its directors. Harold G. Cortis, who had represented these individuals, continued to act as their personal attorney and also was elected a vice-president and general counsel for defendant. Its capital structure consisted of a million shares at the par value of five dollars. In payment for Roman's interest in these South American oil fields, which possessed slight if any value, 700,000 shares of defendant's stock was issued with the agreement that Roman should return 200,000 shares to McCornick as trustee. Plaintiff was a member of the committee which negotiated this purchase and, as director, he voted for it. When he took such action he knew that he was to receive a one-sixth interest in the greater part of the 700,000 shares issued to Roman for his worthless property. Roman stood by his bargain. The 200,000 shares were returned by him for corporate purposes and the remaining 500,000 were divided among the members of the syndicate. Roman retained 75,000 shares and each of the promoters received a one-sixth interest in 425,000 or 70,833 shares. This stock, for which they paid nothing, was deposited in escrow with a partnership of stockbrokers of which McCornick was senior member. Before the expiration of the escrow agreement, McCornick and one or more of his associates contemplated the marketing of a large issue of treasury stock. Sale at par, without a bonus, was impossible and, accordingly, the plan was adopted to deliver to the purchaser as a bonus a sufficient number of shares from the 425,000 then held in escrow for the benefit of the six individuals comprising the syndicate. McCornick, who from the beginning had acted as promotion manager, stated to and promised Cortis, who recognized him as a personal client:

" I will take care of Whitney and Drake and you take care óf Filer." The attorney wrote to plaintiff informing him of the desirability of securing enough shares as a bonus to render possible a sale of the treasury stock at par and stated that stock to be contributed by the various members of the syndicate was to go into the pool which had been set aside for the exclusive use of the corporation. He also communicated to plaintiff the fact that " Clarence thinks that you should contribute twenty-five thousand shares." Plaintiff replied: " I am perfectly willing to do this, if it is in proportion to my share and on that basis I am enclosing you an assignment for that purpose." This document reads: " May 3, 1921. I hereby assign to C. K. McCornick twenty-five thousand (25,000) shares of my Creole Syndicate stock held in escrow by McCornick and Fagan. It being understood that this is my *pro rata* proportion of a contribution of two hundred and forty thousand (240,000) shares to be contributed by members of the Syndicate to the Treasurer of the Company as a bonus for the sale of the treasury stock. W. G. Filer." Plaintiff's shares thus assigned to McCornick eventually constituted, according to McCornick's testimony, part of the bonus. McCornick never kept his promise to " take care " of Whitney and Drake nor did he make any contribution from his own holdings. Roman donated 34,000 and Thompson, another member of the syndicate, 30,000 shares. After the expiration of the escrow agreement, 45,833 shares were delivered to plaintiff. It does not appear that he parted with value for them or for the shares which he contributed as part of the bonus. The opposite inference is plain. Judgment in excess of $385,000 for conversion of his 25,000 shares has been entered against the corporation. The correctness of this judgment depends upon the answer to the question whether plaintiff's assignment to McCornick was made upon the condition that the other promoters should also contribute stock or was made

merely in reliance upon a collateral individual promise by McCornick.

Neither in his letter to Cortis nor in his assignment to McCornick nor elsewhere did plaintiff expressly impose any condition. He reminded his associates of his understanding of their promise. He never provided, even by implication, that his assignment should be ineffective until the others should have actually contributed their proportion. He did not qualify his act nor restrict its operation nor indicate that the passing of title should be dependent upon the happening of some event. He refrained from making a limited agreement to assign only in the event that circumstances should result as he hoped and probably believed; he actually did assign and then awaited the fulfillment of his hopes which arose from McCornick's promise. His transfer was absolute and to the document passing title he merely attached the expression of his understanding that McCornick would abide by his pledge to procure delivery by the other members of the group. Even if plaintiff's understanding that this agreement to contribute should not be regarded as extending beyond his proportionate share and that his contribution of stock should constitute part of the bonus could be regarded as implied conditions, then performance of both of them has been complete. Instead of parting with 240,000 shares as a bonus in accordance with the original scheme, the syndicate threw in only 150,000 shares. Plaintiff's gift of 25,000 was, therefore, his exact one-sixth. Roman and Thompson each contributed at least as much as and possibly more than their proportion. The entire amount of plaintiff's donation was used for the specific purpose for which he made his assignment. The allegation in the complaint that his stock was diverted from the express purpose for which it was contributed has not, therefore, been sustained.

We think McCornick's promise was personal. What is the effect upon corporate liability of the collateral

promise made by an individual who also was defendant's president? This question is similar to the one settled by our decision in *Rosenwasser* v. *Blyn Shoes, Inc.* (246 N. Y. 340). That plaintiff entered into a contract with defendant corporation for the purchase of a block of its stock, he performed it and the stock was delivered to him. His purchase was induced by promises made to him by agents, officers and directors of defendant corporation that a corporation which plaintiff controlled would be favored by them and defendant corporation. In an action to rescind we held that the corporation was not liable for the failure of the individuals, who were also corporate officers, to comply with their promise which induced plaintiff to purchase its stock. The principle here is not different. McCornick's promise clearly was made by him in his individual capacity. The attorney who acted for him in this transaction testified that McCornick was the moving spirit in the syndicate, was recognized as its manager, his word was law in every thing pertaining to the syndicate and that, as attorney, he recognized McCornick and Drake as his clients and managers of the syndicate. So far as the record shows, no minutes of this transaction were kept by the corporation, no resolution adopted, no formal corporate action ever taken. The affair was consummated by telephone conversations and personal letters passing from Harold to Walter and from Walter to Harold in respect to the things which Clarence thought should be done. Most, if not all, of the stock which had then been issued had been divided in the most informal manner and without consideration among the members of the syndicate of promoters and was in possession of the partnership which Clarence McCornick dominated. These individuals were acting in their own interest and apparently paid small, if any, heed to the corporation. At times they did use its form but merely that their own prosperity might be enhanced. In this transaction by McCornick, Cortis and Filer, even

corporate form was excluded. The personal and individual character of the negotiations and the consummation of the whole proceeding are too apparent to be transformed into a corporate affair. Plaintiff's completed assignment which was induced by McCornick's promise includes a condition to no greater extent than the completed purchase by *Rosenwasser* (*supra*) which was likewise induced by personal promises of corporate officers. Neither individual promise can be embraced within any part of a corporate function. Throughout, by the seizure of stock without payment by these promoters, they were acting contrary to the interests of the corporation. Under such circumstances, the corporation is not liable for their acts. If plaintiff possesses rights, let him vindicate them against his personal associates who, he asserts, defrauded him. In no real sense can he be regarded as an investor. Innocent purchasers of stock who in good faith have invested in this corporation many years after plaintiff and his former allies withdrew, ought not to bear the burden of this large judgment which has resulted from dealings in relation to which defendant scarcely bore an existence, except as a legal fiction, and in the consummation of which it never participated.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in the Appellate Division and in this court.

LEHMAN, J. Six men, including the plaintiff, joined together in a speculative venture. Clarence K. McCornick was the active leader of the group. Harold G. Cortis acted as their legal counsel and, to some extent, as expert adviser in regard to the value of oil properties which they contemplated buying. They decided to purchase from one Roman some oil properties or concessions, in Colombia, of somewhat doubtful value. The joint venturers or members of the syndicate had no intention of investing

their own money in such properties. They intended to conduct their venture through the medium of a corporation in which they would acquire a stock interest without any payment by them to the corporation. For that purpose they organized the defendant corporation and called it " Creole Syndicate." The corporate " Creole Syndicate " was controlled and directed by the members of what I may call the syndicate group. McCornick became president of the corporation, Cortis its counsel and vice-president, and the plaintiff one of its directors. The syndicate group having decided to buy Roman's oil concessions, the board of directors of the corporate " Creole Syndicate " gave practical effect to that decision by purchasing the oil concessions through the corporation, in consideration of the issue to Roman of 700,000 shares out of a total authorized issue of 1,000,000 shares of its corporate stock. The plaintiff, as a member of the board of directors, voted for that purchase. The remaining 300,000 shares were still unissued, and the corporation had no other property. In form, Roman merely transferred his property to a corporation in consideration of the transfer to him of all the issued stock of the corporation. In fact, the transaction was a step in carrying out the purposes of the syndicate group. Roman agreed with the syndicate members that he should return to the treasury of the corporation 200,000 shares of stock, and should transfer to the syndicate members 425,000 shares of the remaining 500,000 shares which he had received. As one of the group of six constituting the syndicate, the plaintiff became entitled to one-sixth of the stock transferred to the syndicate. Thus without paying one dollar in money or property for the oil concessions, the syndicate members obtained what was equivalent to a five-sixths interest in them. In return they agreed, expressly or impliedly, that they would " finance " the corporation so that it might be able to develop the oil concessions acquired by the corporation. Apparently

this financing was to be accomplished by loans to the corporation until through the efforts of the syndicate members the corporation could sell the remainder of its stock.

Though the syndicate members by this juggling had obtained a five-sixths interest in oil property without, up till that point, paying anything for it, it turned out that what they obtained was worth little more than they paid. The oil concessions of Roman were worthless or almost so. Other concessions, in some way connected with those they had acquired from Roman, were investigated and the options were bought upon the advice of Cortis.

The corporation had no funds for the acquisition of these new concessions or for the development of the corporate property. Meanwhile some of the members of the syndicate had temporarily made loans to the corporation. The amount of these " loans " varied greatly. The loans from McCornick aggregated $90,000; the loans from plaintiff were only a fraction of this amount. Two of the members of the syndicate preferred to withdraw from the syndicate and to relinquish their interest in the syndicate stock, rather than to advance any moneys for the benefit of the joint venture. H. P. Whitney had acquired the interest of one of these withdrawing members, upon payment of the sum of $75,000. Apparently, though the record on this point is not entirely clear, the payment was made as an advance to the syndicate in the form of a loan to the corporation. The record also fails to make clear what became of the interest of the other withdrawing members in the syndicate stock, but apparently that reverted to the syndicate and could be used by it for advancing its interests. A third member of the syndicate had reduced his interest in the syndicate stock by 30,000 shares, and Roman at the request of the syndicate had returned 34,000 of the shares which he had received and retained upon the purchase of the oil concessions.

I have referred to the syndicate arrangement as a joint venture. It was in fact a joint venture only in a qualified sense. The parties had originally agreed to share profits equally, through equal interests in the syndicate stock. Probably they did not contemplate that any losses would fall upon them, for through the medium of a corporation they were trying to arrange that losses, if any, would fall upon those who might be induced to buy the corporate stock. To carry out the purposes of the syndicate, it was necessary to sell the corporate stock, and, expressly or impliedly, the members of the syndicate had obligated themselves to make such sales possible, and for that purpose to advance such funds as might be necessary, at least temporarily. Perhaps they had not agreed to make such advances equally or to share losses occasioned by these advances; perhaps each was to determine for himself what advances he might choose to make; but even this is doubtful, and other implication might be found in the plaintiff's own testimony.

The transactions which give rise to this litigation arose in connection with the sale of corporate stock intended to make the syndicate venture successful and to give value to the corporate stock owned by the syndicate members. The implications in what was said and done depend upon those circumstances. The stock of the corporation had a par value of five dollars and could not be issued for less than that amount. At that time the corporation owned only undeveloped property of dubious value. Its stock could not be sold at its par value. It had in its treasury what remained of the stock returned by Roman. In addition, either the syndicate or the corporation had about 70,000 shares originally allotted to the member who had withdrawn from the syndicate, and the 64,000 shares returned by another member and by Roman. This stock could be used as a " bonus " to induce subscriptions for the unissued stock at its par value, but it might not be sufficient for that purpose. Cortis

was vice-president of the corporation; he was also counsel for members of the syndicate. He discussed the matter with Clarence McCornick, who was president of the corporation and who also had charge of the syndicate affairs. Probably neither party to that discussion differentiated in his own mind between his official corporate connection and his connection with the unofficial syndicate, but the only fair inference is that the discussion concerned what the members of the syndicate could and should do to facilitate the sale of the corporate stock to carry out the syndicate purposes. After that conversation, Cortis wrote to the plaintiff a letter on the letterhead of the corporation, but again the entire tone of the letter shows that Cortis regarded the corporation and the syndicate as identical in interest, if not in form, and that he was writing, at least primarily, in behalf of the syndicate to the plaintiff as a member of the syndicate, requesting a contribution of corporate stock which was to go into a syndicate pool of 240,000 shares of stock " which has been set aside for the exclusive use of the corporation." The assignment by the plaintiff was made to the syndicate and not to the corporation. The stock so assigned then became part of the pool " which has been set aside for the exclusive use of the corporation."

Until that time the members of the syndicate were the only stockholders of the corporation, with the exception of Roman, who owned 41,000 shares given as consideration for his almost worthless property. The syndicate which created the corporation as an instrument for carrying out the syndicate purposes had used the corporation as if it had no existence apart from the syndicate. The plaintiff as a director of the corporation had voted to issue 425,000 shares of corporate stock in part payment of the oil concessions, with knowledge that these shares were to become the property of the syndicate which did not own the concessions and which gave no value for them. His own shares in the corporation were obtained

in disregard of his duties as a director of the corporation and in fraud of corporate rights, unless he regarded the syndicate and the corporation as one in fact, if not in form. By the use of stock in the syndicate pool, together, perhaps, with some stock still in the treasury of the corporation, the corporation was enabled to obtain, from an investor, the sum of $750,000 for 150,000 shares of its unissued stock, together with 150,000 shares given as a " bonus." Then the corporation was no longer merely an instrument to carry out the syndicate purposes. These were complete. The corporate stock still owned by the members of the syndicate was delivered to them, and the syndicate was disbanded. Upon the division of the corporate stock the plaintiff received 45,000 shares.

Through the use of the moneys obtained upon the sale of its stock, the corporation was enabled to pay off the moneys loaned to it by the members of the syndicate, including moneys loaned by the plaintiff. It was enabled to develop its oil property and the stock still retained by members of the syndicate became valuable. After a time control passed from the syndicate members to purchasers of their stock. Then the plaintiff asserted the claim that the assignment of 25,000 shares of his stock to the syndicate pool was made upon the condition that four other members of the syndicate should each make the same contribution to a syndicate pool of 240,000 shares, and that since that condition was not complied with, the corporation had converted his stock. If there was fraud or wrong, it was practised by the members of the syndicate. If they or the corporation, then substantially owned and controlled by them, converted his stock, the stock at that time was of little value. Nevertheless, for the alleged conversion of that stock originally obtained by the plaintiff through his vote as a corporate director without payment of any consideration, a judgment for over $385,000 has been rendered in favor of the plaintiff against the corporation which

is no longer owned by those who it is said defrauded him.

It would be strange, indeed, if our rules of law produced a result so extraordinary; by which the plaintiff has been enriched, and the innocent stockholders have been proportionately impoverished, because of an alleged wrong done by the officers of the corporation for their own ends and which in fact caused the plaintiff little, if any, damage and from which, indeed, he derived some benefit. I do not think that we need now determine whether a correct rule of damages has been applied for that alleged wrong, for in my opinion no wrong has been committed by this defendant.

The assignment of the plaintiff was undoubtedly made to a syndicate pool created to advance the purposes of the syndicate. It could be used by the syndicate only to provide a " bonus " upon the sale of stock by the corporation. It could be used by the corporation only if delivered to the corporation by the syndicate. The assignment recites that " it is understood that this is my *pro rata* proportion of a contribution of 240,000 shares to be contributed by members of the Syndicate to the Treasurer of the corporation as a bonus for the sale of the treasury stock." Now we are asked to read into the assignment, by implication, a condition that the assignment should not be complete and effective unless or until the other members of the syndicate had also contributed their *pro rata* share to the syndicate pool. It seems to me that there is little, if any, basis for such an implication, and that the only reasonable inference to be drawn from the circumstances is that the plaintiff, in reliance upon an understanding that his co-venturers would make proportionate contributions, made a present and unconditional assignment of his stock to a syndicate pool, to be used for the purpose of providing a bonus for the sale of the stock of the corporation. Perhaps that " understanding " was based on the contents of the letter from Cortis. Perhaps the assignment and the letter accom-

panying the assignment constituted an offer by the plaintiff to contribute that amount of stock to the syndicate pool if the other members of the syndicate would agree to contribute similar proportionate amounts of stock, and that the use of the stock thereafter by the syndicate constituted an acceptance of that offer. Perhaps if thereafter they repudiated the obligation created by the acceptance of the offer, the plaintiff might have rescinded the agreement and demanded back his stock. Nevertheless, the circumstances show that he intended to part with his whole property in the stock which he then and there contributed to the syndicate pool, and to put it within the power of the syndicate to use that stock as a bonus upon the sale of the corporate stock; and such use did not constitute a conversion of the stock. Certainly it would seem that at least a fair inference might be drawn that such was the plaintiff's intention, and the finding of the trial justice was not against the weight of evidence.

Even if, however, the assignment was subject to the implied condition that the other members of the syndicate would make a similar *pro rata* contribution of stock to the syndicate pool, and those who controlled the syndicate pool by their use of the plaintiff's stock, without complying with that condition, converted his stock, it does not follow that the corporation is responsible for such conversion. The corporation was authorized by the members of the syndicate, including the plaintiff, to negotiate a sale of its corporate stock with a bonus of stock. The members of the syndicate had agreed to furnish to the corporation from a syndicate pool created for that very purpose sufficient stock to provide such a bonus. As I have said, the record does not clearly disclose what stock, aside from the stock of the plaintiff, was actually in the pool, was in the corporate treasury available for that purpose. The negotiations were consummated after Cortis, acting for the corporation, had been

informed that there was enough stock in the syndicate pool to enable the corporation to make the sale. Doubtless those who gave that information, in behalf of the syndicate manager, included the plaintiff's 25,000 shares in the pool stock. Thereafter the syndicate delivered to the corporation enough stock from the pool to provide the required bonus, but the record is too vague to require, or perhaps even to justify, a finding that the plaintiff's stock was included in that delivery. If it was not included, then there is no evidence to sustain the plaintiff's claim that the corporation converted the stock. Then it remained part of the syndicate pool not delivered to the corporation, and if there was any conversion, that occurred thereafter when the plaintiff made a futile demand for the return of the stock from the syndicate pool.

If, nevertheless, we should assume upon this record that the plaintiff's stock was delivered to the corporation and used by it to provide a bonus for the sale of its stock, the plaintiff's situation would not be improved. He knew that if the syndicate members made *pro rata* contribution to the syndicate pool in accordance with the "understanding" of the plaintiff, the pool would have 240,000 shares available for use as a bonus on the sale of stock by the corporation, and that only 150,000 shares had in fact been used as a bonus. Without inquiry on his part as to whether the full 240,000 shares had been contributed to the pool, and without demand for the return of any part contributed which had not been used as a "bonus," he accepted the benefit of that sale. He received, from the cash proceeds of the sale, about $23,000 in repayment of "loans" previously made by him to the corporation, and the 45,000 shares of stock which he still retained after his assignment of 25,000 shares became very valuable because through that sale the corporation acquired adequate capital. He says that he was not required to make any inquiry because he had a right to assume that his stock had not been used by the

syndicate pool until the condition upon which the assignment was made was complied with. It is difficult for me to see why any greater duty of inquiry rested upon the corporation or its officers, before they used the stock which the syndicate delivered to them. True McCornick, the president, even without inquiry knew all that had occurred, but throughout the transaction McCornick was acting rather as syndicate manager than as president of the corporation. Any directions he gave in connection with this transaction were given as syndicate manager. If there was fraud, he defrauded the corporation as well as the plaintiff. Cortis, the vice-president, was the corporate officer who, as far as the record discloses, asked those in charge of the syndicate pool for stock to be used as a bonus in connection with the sale of corporate stock; received the stock from the pool and then directed its delivery to the purchaser. As a witness for the plaintiff, he testified that while he knew of the terms of the plaintiff's assignment, he did not know that these terms had not been complied with. If the plaintiff was justified in accepting the benefits of the sale without inquiry as to whether the terms upon which he offered to assign his stock had been met, then the corporation was justified in using the stock delivered to it, in connection with that sale, without similar inquiry.

In truth, it seems to me that the judgment rests upon a misconception of the relations of the syndicate group and the corporation. The syndicate, to carry out its purposes, created the corporate entity. The officers of the corporation, in the performance of their official duties, acted as agents of the corporation, but at the same time both officers and directors in the exercise of their control of the corporation, in fact, acted as agents of the syndicate. In dealing with the public they were held out to be, and were in fact, corporate agents. In dealing with the syndicate and its members and in carrying out the syndicate purposes they were the masters of the corporation and the agents of the syndicate. The plaintiff,

as a member of the syndicate group, joined in the creation of the corporate defendant to carry out the syndicate purposes. As a director he used his own official powers to further these purposes. He knew that the sale of the corporate stock was merely another step in carrying out these purposes. If the officers of the corporation, in the exercise of their official powers, have committed a wrong toward the plaintiff, it was with his consent and assistance, and for his purposes, that they were given these corporate powers. For wrong done to him through the exercise of their control of the corporation, which they were intended to exercise for his benefit rather than for the benefit of the corporation, the corporation cannot be held liable. He may not claim that these wrongs were committed by the corporation acting through its agents.

For these reasons I think the judgment should be reversed.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in the Appellate Division and in this court.

POUND, CRANE, KELLOGG and HUBBS, JJ., concur with O'BRIEN and LEHMAN, JJ.; CARDOZO, Ch. J., concurs in result.

Judgment accordingly.