In the Matter of the Estate of MARK ROTHKO, Deceased. KATE ROTHKO et al., Respondents; BERNARD J. REIS et al., as Executors of Mark Rothko, Deceased, Appellants-Respondents; ATTORNEY-GENERAL OF THE STATE OF NEW YORK, Respondent-Appellant.

First Department, March 28, 1977

*Edward J. Ross* of counsel *(James R. Peterson* with him on the brief; *Breed, Abbott & Morgan,* attorneys), for Kate Rothko, respondent.

*Arthur Richenthal* of counsel *(Richenthal, Abrams & Moss,* attorneys), for Theodoros Stamos and another, appellants-respondents.

*Bernard H. Greene* of counsel *(Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Morton Levine, appellant-respondent.

*David W. Peck* of counsel *(John W. Dickey, David M. Olasov*

and *Pamela S. Dwyer,* with him on the brief; *Sullivan & Cromwell,* attorneys), for Marlborough Gallery, Inc., and others, appellants-respondents.

*Gustave Harrow* of counsel *(Laura Werner* with him on the brief; *Louis J. Lefkowitz, Attorney-General),* for ultimate charitable beneficiaries, respondent-appellant.

*Gerald Dickler* of counsel *(Paul Sarno* with him on the brief; *Hall, Dickler, Lawler, Kent & Howley,* attorneys), for Barbara B. Northrup, as guardian of the person and property of Christopher Rothko, respondent.

*Judith A. Ripps-Goldstone* of counsel *(George DeSipio* with her on the brief; *Cleary, Gottlieb, Steen & Hamilton,* attorneys), for Mark Rothko Foundation, Inc., respondent.

LANE, J. We would affirm the decree with one modification (to be discussed later), on the comprehensive opinion of Surrogate MIDONICK (84 Misc 2d 830). However, a few additional comments are necessary to clarify our position.

We are all in agreement that the executors Reis and Stamos had a conflict of interest and divided loyalty in view of their nexus to Marlborough Gallery, Inc. A majority of this court is also in agreement with the assessment of the liability of the executor Levine which was made by the Surrogate. Furthermore, we concur in the findings of liability against the Marlborough defendants and the individual Frank K. Lloyd. It is only regarding the measure of damages where we are in disagreement.

Firstly, it might be appropriate to dispel any notion that the 1970 agreements with Marlborough Gallery, Inc. and Marlborough A.G. were in any way prudent or done in the best interest of the estate.

On February 21, 1969, Mark Rothko entered into an agreement with Marlborough A.G. which provided in pertinent part that "Mark Rothko agrees not to sell any works of art for a period of eight years, except to Marlborough A.G. if a supplementary contract is made." A supplementary agreement of even date provided that: "Mark Rothko has the option to sell to Marlborough A.G. an additional four paintings each year at prices not below Marlborough A.G.'s then current selling prices, the price to be paid being [90%] of the current selling prices."

Though the executor Reis and Marlborough A.G. separately obtained letters from their respective counsel on the binding effect of the 1969 agreements, no attempt was made by the executors to institute court action to test the validity of the agreements or the scope of the restrictions. It is noteworthy that the estate was not cash-poor, and there was no compelling need to liquidate assets for payment of any liabilities.

Assuming, as counsel for Reis and Marlborough A.G. suggested, that the agreements were binding on the estate, no effort was made to adhere to the agreements and to restrict the sales of paintings to four paintings per year to test, at least, the market for the paintings,* but rather a new agreement was reached for the outright sale of 100 paintings at a price of $1,800,000. This sale resulted in relinquishing of control of the paintings, an element considered by at least one expert to be crucial in husbanding the estate assets. The relinquishing of control could result in a diminution of the fullest value of the paintings by causing a sudden glut on the market.

Even in the absence of the control suggested by the expert, the sales of paintings which occurred in 1970 and 1971 are instructive as to their value and illustrate the extent to which the estate was denuded and defrauded. In 1970, the four highest prices for the paintings from that group of 100 fetched the total sum of $433,750. In 1971, the four highest-priced paintings reaped a total income of $304,100.

In the first two years, then, a total of $737,850 was realized from the sale of only eight paintings. Their total value to the estate, if sold under the terms of the 1969 "binding" agreements, would have been $664,065. The sale of eight paintings would then have benefited the estate to the extent of approximately one third of the total price paid for all 100 paintings and would still have left 92 paintings for future sale.

This must be viewed in contrast to the moneys actually received by the estate. Under the 1970 agreements, $200,000 was received in 1970 and $133,333.33 was received in 1971. A total of $333,333.33 for the two-year period was received, as opposed to a potential $664,065, which would have been received if there had been adherence to the 1969 agreements.

This certainly illustrates the improvidence and wastefulness

---

* The expert Heller noted, for example, that after the death of a painter such as Rothko, the value of his works of art could be expected to appreciate considerably.

of the 1970 agreements and emphasizes the bad faith in the execution of those agreements.

Now we must attend to the question of the measure of damages. The Surrogate awarded "appreciation damages" and explained the basis for that award in detail (84 Misc 2d 830, 873-879). We agree with his analysis and find further support for his rationale in the case of *Menzel v List* (24 NY2d 91). *Menzel* involved the purchase by Mrs. Erna Menzel of a Chagall painting in 1932 for $150. When Mrs. Menzel fled Belgium, the painting was appropriated by the Nazis in 1941. Ultimately, in 1955, it fell into the hands of the proprietors of a New York art gallery, Mr. and Mrs. Klaus Perls. They had purchased the painting from a Parisian art gallery for $2,800. The Perls in turn sold the painting to Albert List for $4,000. Mrs. Menzel saw a reproduction of this painting in an art book, accompanied by the statement that it was in List's possession, and she demanded its return. Upon his refusal to return the painting, Mrs. Menzel instituted a replevin action against List. List in return brought a third-party action against the Perls, claiming liability for breach of implied warranty of title. List returned the painting to Mrs. Menzel and, with regard to the third-party action, a jury after trial found in favor of List against the Perls in the amount of $22,500, the painting's present value.

Our Appellate Division (28 AD2d 516) modified that award by reducing it to $4,000 (the purchase price paid by List). The Court of Appeals, however, found that an injured buyer is not compensated by recovery of an amount placing him in *status quo ante,* but he is, rather, entitled to the benefit of his bargain *(Menzel,* cited *supra,* pp 97-98). The meaning of this language was made perfectly clear by Judge BREITEL in *Simon v Electrospace Corp.* (28 NY2d 136, 144-145). Judge BREITEL there pointed out that in a replevin action, or in an action where restitution or specific performance is allowed, the measure of damages is the value at the time of the trial, on the theory that the true owner had a continuing right to possession of the painting and can be made whole only by return of the item or by payment of its value at the time of trial.

"It may be as well to remark here as anywhere, that the rule of damages should not depend upon the form of the action. In civil actions the law awards to the party injured a just indemnity for the wrong which has been done him, and no more * * * the inquiry must always be, what is an ade-

quate indemnity to the party injured, and the answer to that inquiry cannot be affected by the form of the action in which he seeks his remedy." *(Baker v Drake,* 53 NY 211, 220.)

It matters not, therefore, for our purposes, that *Menzel* involved an action in replevin and breach of implied warranty of title while the case at bar involved a breach of fiduciary duty. In both instances, return of the items wrongfully sold was required and therefore, if the wrongdoers (the executors in our case) cannot return the paintings, they must pay the value of the paintings at the time of trial.

However, discussion of the general rules regarding the measure of damages in cases based on conversion should not result in a different resolution of the issues presently before this court.

Concededly, the general rule with regard to the measure of damages in conversion is to award the value of the property at the time of conversion, together with interest *(Jones v Morgan,* 90 NY 4, 10; 10 NY Jur, Conversion, § 69).

However, where the conversion of an item of fluctuating value is involved, then damages are measured by considering the highest market value within a *reasonable time* after notice of the conversion *(Baker v Drake,* 53 NY 211, 217, *supra; Mayer v Monzo,* 221 NY 442, 446; *Hartford Acc. & Ind. Co. v Walston & Co.,* 22 NY2d 672, 673).

"Reasonable time" is not susceptible of easy interpretation. Early case law fashioned a broad rule that where the item converted is subject to price variation, then the highest market value until the time of trial is the proper measure of damages (1 Clark, New York Law of Damages, § 459, p 786, and cases cited thereat).

In the case of conversion of stock, this broad rule was rejected *(Baker v Drake,* 53 NY 211, *supra;* 10 NY Damages Law, § 908). However, where the property involved is unique and irreplaceable, such as the works of art in the case at bar, then failure to return the property must result in the wrongdoer's responding in damages to the extent of the value of the item at the time of trial *(Menzel v List,* 24 NY2d 91, *supra).*

Nor should this court consider that the property involved may have been enhanced in value through the expenditure of money by the wrongdoers in promotion of these works of art. Increase in value by the labor of the wrongdoer without change in the character of the property improved inures to

the benefit of the wronged party, and the wrongdoer is entitled to no credit therefor (1 Clark, New York Law of Damages, § 467, p 803; 10 NY Damages Law, § 911).

A specific response to points raised in the opinions of Justices KUPFERMAN, CAPOZZOLI, and NUNEZ is in order.

*Sheldon v Metro-Goldwyn Corp.* (309 US 390), cited by Justice KUPFERMAN, is a case dealing with apportionment of *profits* owed to one injured by a copyright infringement. Its weight is unpersuasive in assessment of damages in the case at bar, involving value of items wrongfully sold.

Justice CAPOZZOLI's concern regarding the uneven treatment of the executor Levine as compared with the treatment of the executors Reis and Stamos overlooks the fact that the malfeasance of the latter two executors was active and deliberate, while Levine took a more subdued role in the form of acquiescence. His surcharge therefore should not be the same as that of the other executors.

The citation by Justice NUNEZ to Scott on Trusts, as quoted by the Surrogate, is somewhat incomplete. That portion of the quotation omitted offers some support to our position in regard to appreciation damages. The Surrogate stated (84 Misc 2d, at p 873): "[P]rofessor Scott in his work on Trusts (3d ed, vol 3, § 208.3) states that: 'Where the trustee sells trust property which it is his duty to retain, the beneficiaries are not limited to a recovery of the value of the property at the time of sale; if the property has subsequently appreciated in value or if income would have been received thereon if the trustee had retained it, they are entitled to its present value together with such income, since they are entitled to be put in the same position in which they would have been if the trustee had not committed a breach of trust but had retained the property as it was his duty to do.'"

There is one modification, however, which we would make. The last sentence of paragraph 18 of the decree reads, "The new fiduciary shall have the option in the first instance to specify which paintings the fiduciary shall accept." We are of the opinion that the new fiduciary should not be given the option to reject any painting which is returned in accordance with the mandate of the decree.

Accordingly, the decree of the Surrogate, New York County, entered January 16, 1976, should be modified on the law to the extent of deleting the last sentence of decretal paragraph 18 and otherwise affirmed, without costs or disbursements.

Although we are of the view that an appeal lies as of right to the Court of Appeals from the above disposition, in the event that court disagrees, on the basis that our disposition is viewed as nonfinal, we unanimously grant, *sua sponte,* leave to appeal to the Court of Appeals to all parties desiring to do so from such parts of this court's order as affects them on the certified question: Was the decree of the Surrogate's Court, as modified by this court, properly made?

KUPFERMAN, J. (concurring in part and dissenting in part). While there is much wisdom in the dissents, the conflict of interest in which the executors placed themselves cannot be ignored. (See *Matter of Scarborough,* 25 NY2d 553, 558.) Executor Reis drafted and supervised the execution of the will. He was a certified public accountant, and although not licensed to practice law, had graduated from law school. If there was meant to be a continuation of the previous relationship without an arm's length negotiation or prior court approval, the will could have so provided.

Despite the fact that the application of the determination in *Menzel v List* (24 NY2d 91) requires that the injured party receive the full benefit of a proper bargain, this does not mean that we can ignore the relationship between the parties. There was the previous supplementary agreement entered into in February, 1969, which gave to Rothko the right to require the purchase by Marlborough (in the nature of a "put") of up to four paintings a year for eight years. This would have meant for some part of that period a price less than was found by the Surrogate inasmuch as that contract provided for a payment of 90% of "then current selling prices" with respect to these items. Further, Marlborough has returned paintings and received credit for the return of any paintings that the administratrix *c.t.a.* would agree to accept. She has rejected some. If we affirm the Surrogate's determination, based on an average of $90,000 for a work on canvas, and $28,000 for a work on paper, we must recognize that these figures are what they purport to be, just an average. On that basis, the administratrix should not have a choice, but should be compelled to accept as a reduction of damage whatever is proffered to her. In addition, the valuation for the purpose of damages did not take into consideration a possible deduction for an agent's commission or selling or promotion services. (Cf. *Sheldon v Metro-Goldwyn Corp.,* 309 US 390.)

Although I have expressed reservations with respect to

various factors to be considered in the calculation of damages, I concur in the basic conclusion and, therefore, in order to resolve the matter for the purpose of appeal, vote to modify as per the opinion of Justice LANE.

CAPOZZOLI, J. (dissenting in part). I join my colleague, Mr. Justice NUNEZ, in his dissent and concur in his views.

I would add, by way of emphasis, that, as was noted by Mr. Justice NUNEZ, there is a difference between the case of *Menzel v List* (24 NY2d 91) and the case at bar. In the former the court was dealing with a painting which was stolen, The thief could at no time convey a good title, so that anyone who came into possession of that painting was subject to an order of the court to deliver same to the true owner or, if that could not be done, then to pay to the true owner the value of same as of the time of the decree. The situation in the case at bar does not deal with stolen paintings. The executors and trustees were expected, by way of discharging their duties, to turn the assets of the estate into cash. They were authorized and expected to sell. As was noted by the Surrogate in his comprehensive decision (84 Misc 2d 830, 876): "If in the area of trusts and estates the sole purpose of damages is to make the beneficiary whole, it would seem that when a fiduciary is authorized to sell and he sells to himself or to another with whom he is closely associated, the actual injury to the beneficiary is the difference, if any, between the price paid and the price which could have been obtained on the market."

The Surrogate then went on to discuss the award of appreciation damages under certain conditions and said (p 877): "While such damages might not be absolutely necessary for adequate protection of the beneficiary, the awarding of such consequential damages is justified as a deterrent to future conduct of this nature by fiduciaries." But, he cites no relevant authority for this statement. I do not believe that, under the circumstances of this case, punitive damages should be awarded. I can understand the different measure of damages where the trustee sells trust property which it is his duty to retain. Again, this is not our case. The executors were not directed to distribute in kind. They had the power of sale.

It has been noted that the Surrogate, while holding appellants, Reis and Stamos, liable for the paintings as of the time of the decree, he did hold appellant, Levine, liable only for the actual value of the paintings as of the date of the sales. It is difficult to understand why these three appellants should be

treated differently. Whatever damages were suffered by the estate, the Surrogate found they were suffered by the actions of these three executors. The three of them are in the same position to the estate. Each of them should be held to answer for the same measure of damages. In effect, they are charged with failing to get fair market value for the paintings sold by them. Hence, if it be shown that they were sold for less than the market value, as a result of the breach of trust by these executors, then the estate is entitled to be given the difference between the market value and what was actually obtained. I know of no principle of law which justifies the position of the majority in distinguishing the actions of Levine from those of Reis and Stamos on the basis of activity and deliberateness. The rule is clear, they are subject to the same liability for their failure to carry out their duties as fiduciaries.

Therefore, with Mr. Justice NUNEZ, I would modify to remand this case but only to determine the reasonable value of the paintings as of May, 1970, and award damages, if any, without any consideration of punitive damages, as they should not be awarded in this case. The damages properly due to the beneficiaries are compensable damages which are intended to make the beneficiaries whole.

NUNEZ, J. (dissenting in part). I part company with my brethren of the majority and Surrogate MIDONICK only on the issue of damages. The Surrogate correctly found that the executors had the power of sale (EPTL § 11-1.1, subd [b], par [5], cl [B]) and were not required to distribute in kind. The general rule is that executors, absent any authorization or direction in the testator's will, are duty-bound to wind up the affairs of the estate except for the temporary purpose of converting the assets into money (cf. *Willis v Sharp,* 113 NY 586, 589; *Matter of Begent,* 37 AD2d 310, 311). In *Matter of Sheinman* (52 Misc 2d 220, 230) Surrogate DI FALCO applied this principle to an estate holding art works, including paintings, stating: "An estate representative is not expected to open a retail store and dispose of the items singly to different buyers."

I agree that the May, 1970 sale of the paintings was improperly made to Marlborough because of the conflict of interest of executors Reis and Stamos, but I seriously doubt that anyone would have questioned the sale and consignment of these paintings had they been sold to any other dealer in an arm's length transaction. I agree with the Surrogate (p

861) that "it cannot be gainsaid that the promotional efforts of Marlborough had a major effect in publicizing Rothko's works and in creating a market for his product at higher prices, far higher than date of death values." Nor can it be gainsaid that Marlborough deserves much credit for creating a market for Rothko paintings during the artist's lifetime. And some of us are of the opinion that the extensive publicity given to this litigation which has become somewhat of a "cause célèbre" also enhanced the value of Mr. Rothko's works. The price of $1,800,000 for 100 paintings does not compare unfavorably with the value of the decedent's paintings set by him in February, 1969 when he sold 87 of his paintings to Marlborough for $1,050,000 payable over 14 years under two contracts which gave Marlborough the exclusive right to sell Mr. Rothko's works of art for a period of eight years. I note that although no relief was sought by petitioner-respondent with respect to these contracts, the Surrogate found that "from their conduct" the parties "intended to abandon and abrogate" them. Thus, the Surrogate *sua sponte* disposed of the 1969 *inter vivos* agreements which were a significant obstacle to the executors to sell the estate's paintings to any dealer other than Marlborough. Surely the exclusive covenant affected adversely the executors' bargaining power and the sale price of the property.

The Surrogate conceded that "[i]f in the area of trusts and estates the sole purpose of damages is to make the beneficiary whole, it would seem that when a fiduciary is authorized to sell and he sells to himself or to another with whom he is closely associated, the actual injury to the beneficiary is the difference, if any, between the price paid and the price which could have been obtained on the market." (84 Misc 2d 830, 876.) Scott on Trusts is cited as authority for the imposition of "appreciation damages." But the quoted passage (3 Scott, § 208.3) as I read it, holds to the contrary: "The beneficiaries are not entitled to the value of the property at the time of the decree if it was not the duty of the trustee to retain the property in trust and the breach of trust consisted merely in selling the property for too low a price. In such a case, although he is liable for the difference between its fair value and the price at which he sold it, he is not accountable for any subsequent rise in its value." (See, also, Restatement Trusts 2d, §§ 205 and 208 which takes a consistent position.) The imposition of "appreciation damages," i.e., punitive damages

based on present values, is contrary to New York authority which treats self-dealing as a "conversion." (E.g., *Zimmerman v Kinkle,* 108 NY 282, 287; *Fleck v Perla,* 40 AD2d 1069, 1070; *Bonham v Coe,* 249 App Div 428, 431, affd 276 NY 540.) Damages for conversion are computed on the basis of the value of the property at the time and place of conversion, plus interest. (See *Jones v Morgan,* 90 NY 4, 10; *Jones v National Chautauqua County Bank,* 272 App Div 521, 528; *Filer v Creole Syndicate,* 230 App Div 509, 512, revd on other grounds 256 NY 346; 1 Clark, New York Law of Damages, §§ 448, 458.) The only exception is when the property involved is securities or commodity futures regularly traded in a public market or exchange where prices fluctuate widely. In such cases damages are fixed from the time of conversion until a reasonable time thereafter in which to effect replacement. (E.g., *Hartford Acc. & Ind. Co. v Walston & Co.,* 22 NY2d 672, 673; *German v Snedeker,* 257 App Div 596, affd 281 NY 832; *Jones v National Chautauqua County Bank, supra; Filer v Creole Syndicate, supra.)*

Although expressly disavowing petitioners' entitlement to punitive damages, the Surrogate allowed recovery of so-called "appreciation damages." The punitive nature of the recovery is clear when we consider that the court justified the appreciation damages "as a deterrent to future conduct of this nature by fiduciaries" (p 877) and that two of the executors were assessed substantially higher damages than the third in the identical transaction. The imposition of such measure of damages is not supported by the cases cited by the court which are materially distinguishable from this case.

*Menzel v List* (24 NY2d 91) cited by the majority as support for the appreciation measure of damages, is inapplicable. *Menzel* involved a stolen painting. The action was by a buyer against a seller for breach of warranty of title. It was, as the court stated, "an action on the contract." Here the contract has been disavowed, rescinded. Here the executors concededly had good title and the power and duty to sell and therefore the damages are to be measured as of the time the contracts of sale and consignment were made.

I would modify and remand to determine the reasonable value of the paintings as of May, 1970 and the proper award of damages, if any. I agree that the factors mentioned by Mr. Justice KUPFERMAN should be considered in arriving at such value.

MURPHY, J., concurs with LANE, J.; KUPFERMAN, J. P., concurs in part and dissents in part in an opinion; CAPOZZOLI and NUNEZ, JJ., dissent in part in separate opinions.

Decree, Surrogate's Court, New York County entered on January 16, 1976, modified, on the law, to the extent of deleting the last sentence of decretal paragraph 18, and otherwise affirmed, without costs and without disbursements.

Although this court is of the view that an appeal lies as of right to the Court of Appeals from the above disposition, in the event that court disagrees, on the basis that this court's disposition is viewed as nonfinal, leave to appeal to the Court of Appeals is unanimously granted, *sua sponte,* to all parties desiring to do so from such parts of this court's order as affects them on the following certified question: "Was the decree of the Surrogate's Court, as modified by this court, properly made?"