OPINION OF THE COURT
John M. Thomas, S.
In this contested trustee’s accounting, the beneficiaries of the trust have filed objections to the account on the basis of the trustee’s failure to diversify a portfolio consisting of a high concentration of the common shares of stock in a single corporation.
*684 John P. Saxton died a resident of this county on the 6th day of November 1958, leaving his widow, Anna E. Saxton, and two children, Mary Rita Crittenden and Patricia McDonald, as his surviving distributees. By the terms of Mr. Saxton’s will which was admitted to probate by this court on the 18th day of November 1958, after certain general bequests, a residuary trust was established with lifetime income and necessary principal for the benefit of the decedent’s surviving spouse, Anna, and upon her death the remainder interest was payable outright to the decedent’s two daughters, Mary Rita Crittenden and Patricia McDonald.
The executors’ final account and the final decree of judicial settlement in the estate dated January 25, 1962 contained, among other assets, 1,575 shares of International Business Machines (IBM) common stock valued at $569,853.50 which were turned over to the named trustee to administer pursuant to the terms of the testamentary trust set forth in the decedent’s will.
The decedent’s surviving spouse, Anna E. Saxton, died on March 12, 1993 thus terminating her life estate. The Manufacturers and Traders Trust Company, successor in corporate interest to the original named corporate trustee, the Endicott Trust Company, filed its final accounting as trustee on November 4, 1993, showing on hand as of March 12, 1993 among other assets, 53,692 shares of IBM stock with a market value of $2,986,617.50.
The two daughters of the decedent holding the remainder interest filed their objections to the account of the trustee on December 28, 1993, alleging a breach of the trustee’s fiduciary duty, loyalty, and impartiality, loss of income and principal because of its failure to diversify the corpus of the trust in maintaining the stock portfolio entirely in IBM for a period of over 30 years, despite extensive knowledge within the financial community of the deterioration of IBM’s financial condition, failure to exercise reasonable prudence in the management of the trust, and failure to liquidate the IBM stock in order to sustain its own trustee’s commission. They seek to surcharge the trustee on account of the damages incurred, to deprive the trustee of its commissions, and assess all attorneys’ fees and costs in connection with the defense of the objections against the bank.
The principal defense to the objections and the document upon which the trustee fundamentally bases its justification for retaining the high concentration of IBM stock is an invest *685 ment direction agreement, signed by the life tenant and the two remaindermen on August 23, 1960, which after acknowledging that the entire corpus of the trust consisted of common stock of IBM, consented and directed the trustee to continue to hold the stock rather than following the normal banking procedure of diversification and additionally held the bank harmless from decreases in value of the investment. The instrument further provided that it could be revoked by 30 days’ written notice to the bank by the parties. This agreement is the essential ingredient that distinguishes this case from Matter of Janes (165 Misc 2d 743, mod 223 AD2d 20, affd 90 NY2d 41) recently decided by the Court of Appeals.
Prior to the preparation of the investment direction agreement (hereinafter IDA), on October 2, 1959, Mr. Cooper, then assistant vice-president and trust officer of the Endicott Trust Company, wrote to R. K. Fox, the vice-president of Hanover Bank, the then parent corporation of Endicott Trust Company, seeking his advice on the validity of a letter of indemnification from the beneficiaries regarding the holding of IBM stock and its ability to relieve the Endicott Trust Company from liability of a possible future surcharge. Additionally, Mr. Cooper asked if such a letter would have any tax consequences upon the trust (irrelevant in this proceeding). Respondent’s exhibit 9 is a letter in response from R. K. Fox addressed to Mr. Cooper, dated October 7, 1959, which states among other things: “The trustee appears to have full power of retention under will and any approvals by the beneficiaries would appear to be a gratuitous indication of their satisfaction and we believe would bar them against future criticism. However continued retention at some subsequent date could conceivably be much less attractive and could require reaffirmation of the approvals to continue holding. In short, we do not believe that you can get an approval of this kind that would place the burden of revocation of the approval upon the beneficiaries.” Mr. Fox then concludes by addressing the tax question raised by Mr. Cooper.
Commencing in 1984, the daughters began to meet with the then trust officer William Nesbitt on an annual basis. It was in that period of time that they began to discuss diversification with Nesbitt and continued to do so during 1986. Crittenden averred that the trust officer, Nesbitt, insisted that as long as IBM was on the Irving’s buy list (Irving being the then parent corporation of the Endicott Trust Company) that the bank would continue to hold 100% IBM in the corpus of the trust. In the fall of 1986, the value of the portfolio had reached $7 mil *686 lion. The beneficiaries had been urging the submission of a diversification plan. That year there was going to be a significant capital gains tax increase with the rate increasing from 20% to 28% effective January 1, 1987. The three bank trust officers testifying acknowledged that there were no consultations, recommendations, or even discussions with the beneficiaries relative to the pending capital gains tax increase, and the advisability of diversifying.
At the same time that two of the three beneficiaries of this trust were demanding diversification, Nesbitt was taking the position that his hands were tied as long as there was not a unanimous written revocation of the IDA. The bank’s own policy, set forth in an internal memorandum dated April 29, 1987, provides on the second page under III, Diversification, at subparagraph C (see, respondent’s exhibit 3), the following statement: “Large concentrations of IBM stock — It should be noted that there are several large accounts where we are asked to hold IBM stock, exonerated from holding these stocks as original investments, and yet we have the power to sell them should circumstances dictate. Therefore, these accounts should also be carefully scrutinized and this is one of the reasons for our special review of IBM stock as a corporation holding. At least once a year, a complete review of IBM is presented to the Directors’ Trust Committee meeting. These accounts with large concentrations include the Saxton account #243” (emphasis added). It is abundantly clear from anyone sitting through the trial and listening to the testimony of Nesbitt, that in addition to his blind reliance upon a nearly 30-year-old IDA he was obsessed with the concept that the remaindermen in this trust should take the IBM stock in kind at the death of the life tenant, hold the stock for their entire life, run the stock through their own estates, permitting their heirs to pick up a stepped-up basis. He failed to take into consideration the needs or desires of the majority of the beneficiaries of this trust, he violated his own bank’s policy, and seemed to have no conception in what a dangerous position he was placing his employer by not at least responding to the beneficiaries’ demands with a comprehensive diversification plan.
In October of 1987, in a general market decline, the trust lost over $4 million.
The court has previously noted the distinction between the case at bar and Matter of Janes (supra), but except for the existence of the IDA, and the inter-relationship between the beneficiaries and the trustee, the cases are strikingly similar. In *687 the Janes case, the Appellate Division, Fourth Department, in affirming the Surrogate’s finding of imprudence and breach of a fiduciary duty on the part of the bank, stated (223 AD2d 20, 29), “Thus, in appropriate circumstances, liability for imprudence may be predicated solely on a fiduciary’s investment of a large portion of the estate or trust fund in a single security, regardless of whether the concentration is coupled with other elements of hazard” (citing Cobb v Gramatan Natl. Bank & Trust Co., 261 App Div 1086). The Court of Appeals in affirming the Appellate Division frames the question by stating (90 NY2d 41, 51), “The inquiry is simply whether, under all the facts and circumstances of the particular case, the fiduciary violated the prudent person standard in maintaining a concentration of a particular stock in the estate’s portfolio of investments.” In answering in the affirmative, the Court of Appeals noted that neither the Surrogate nor the Appellate Division based their respective rulings in holding the petitioner liable to any absolute duty to diversify. Rather, the determination was made and was appropriate because maintaining a concentration of Kodak stock, under the circumstances presented, violated certain critical obligations of the fiduciary in making investment decisions under the prudent person rule. Thereafter, the Court pinpoints the violations of the fiduciary in the Janes estate, first by stating that the petitioning bank failed to consider the investment in Kodak stock in relation to the entire portfolio of the estate, citing Matter of Bank of N. Y. (35 NY2d 512). Secondly, the bank paid insufficient attention to the needs and interests of the testator’s widow and life beneficiary of the trust. And finally, the Court of Appeals states (at 54) that there “was evidence in the record to support the findings below that, in managing the estate’s investments, petitioner failed to exercise due care and the skill it held itself out as possessing as a corporate fiduciary”, noting (at 54) that there was proof on the record that: “petitioner (1) failed initially to undertake a formal analysis of the estate and establish an investment plan consistent with the testator’s primary objectives; (2) failed to follow petitioner’s own internal trustee review protocol during the administration of the estate, which advised special caution and attention in cases of portfolio concentration of as little as 20%; and (3) failed to conduct more than routine reviews of the Kodak holding in this estate, without considering alternative investment choices, over a seven-year period of steady decline in the value of the stock.”
*688 The question now comes to this court, was there such imprudence on the part of the bank in the Saxton trust as there was by the bank in the Janes estate, and if there was, does the existence of a 30-year-old IDA protect the bank from the penalty for its breach of its fiduciary duty to these beneficiaries. In the court’s view, the first question is answered in the affirmative and the second question is answered in the negative. The bank was forewarned by the initial letter from Fox to Cooper on October 7, 1959 when he warned that the bank could not continue to rely upon a gratuitous statement by the beneficiaries to protect it in a changing market. Nesbitt, in his obsession with retaining IBM stock, ignored that admonition, his own bank’s policy, and well-known and sound investment concepts. The bank rebuffed the pleadings of the beneficiaries to present a proper diversification plan, never advised the beneficiaries of the 1986 substantial increase in the capital gains tax and the appropriate tax planning that should have taken place at that time, and never counseled the beneficiaries in the changing market situation. Additionally, the bank never, even by admission of their own expert, made a comprehensive evaluation of IBM stock in its relationship to the general market and the industry, and never considered or counseled alternative investment choices over a 30-year period of this trust. All of this took place, despite a decline in the value of IBM, its underperformance compared to the market generally, and eventually the parent bank’s decision to put the stock on the sell list.
The bank held itself out to this family as a professional fiduciary, an expert and superior to an individual trustee. That, in this court’s view, is an important reason it cannot shift the responsibility for its imprudence upon the beneficiaries by a strict interpretation of an ancient IDA.
The court recognizes that with the volume of trusts held by banks, to require annual reviews of ID As where there are united beneficiaries would be an unreasonable burden to place upon the institutions of this State. When, however, there is demonstrated disagreement on the part of the beneficiaries it seems to this court that the bank has the obligation to advise the beneficiaries in writing of the bank’s own investment policy and seek from them a reaffirmation of their desire to continue to retain a high concentration of one issue without diversification. Failing to receive such unanimous reaffirmation, the bank should revert to its own policy within 30 days by implementation of a plan of diversification. It is noted again, as previously done by this court, that the bank’s own expert testified that the *689 bank should not accept an IDA signed by only one of three beneficiaries. If this is so, how can the bank continue an IDA in force where two of the three beneficiaries have rejected the investment policy established therein. In this court’s view, the bank gave the Saxton family 30 years of bad advice. The bank not only breached its own duty to communicate, but breached its own policy of diversification. It failed to communicate significant legislative changes pending in the Tax Law which presented an opportunity to avoid a substantial increase in the capital gains tax. It failed to advise the beneficiaries of changes in the bank’s own policy. It failed to counsel and advise them when IBM was in a steep decline. It failed to advise the Saxton family what it was advising other clients with large holdings of IBM. In short, in this court’s view, the bank breached its fiduciary duty to this family in such a degree that no court of equity or law can permit it to shield itself behind an IDA executed by two beneficiaries, then in their 20’s and 30’s, which they subsequently repudiated time and time again.
As to the date which diversification and divestiture should have taken place, the Court of Appeals in Matter of Janes (supra, at 54, citing Matter of Donner, 82 NY2d 574, 585-586) states “a court may examine a fiduciary’s conduct throughout the entire period during which the investment at issue was held * * * The court may then determine, within that period, the ‘reasonable time’ within which divesture of the imprudently held investment should have occurred” (citing also Matter of Weston, 91 NY 502). The Court of Appeals continues (at 54), “What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary * * * The test remains ‘the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs’ ”. Injected into this review of the fiduciary’s conduct throughout the entire period of the trust is the existence of the IDA. A fiduciary should be entitled to rely on an investment directive from the beneficiaries in contravention of the normal policy of the bank for a reasonable period of time, or until such time that there is demonstrated disagreement among the beneficiaries, provided however that the bank does not completely abdicate its fiduciary responsibility to periodically advise the beneficiaries of time-tested formulas for protecting their investments from the inroads of a fluctuating market. This is a reasonable and fair standard, particularly when considering the fact that a corporate fiduciary holds itself out as an expert, superior to a layman trustee. This professionalism is recognized *690 under the law by permitting a corporate fiduciary to charge more for its services than the ordinary trustee’s commission (see, SCPA 2312). Implicit in this professional standard however is the responsibility on the part of the trustee to consistently counsel trust beneficiaries to assume an investment strategy that is in their own best interest. Although Crittenden and McDonald as remaindermen had a vital interest in the trust, they were not provided with even an annual statement for 24 years from the inception of the trust, and only then by having to demand the same from the bank. Not only was there not any advice on the part of the bank, but there indeed was not even any communication on the part of the bank. What is a reasonable time that a corporate fiduciary should be required to seek reaffirmation of an IDA can only be set forth in this decision as dictum, since there is no precedent for establishing such a benchmark, and it would be unfair to hold a trustee to an ex post facto standard in this proceeding. It seems to this court, however, that with the record-keeping and computer systems available to the modern corporate fiduciary an IDA should be reaffirmed at least every four years, or within 30 days upon any indicated repudiation or disagreement among the beneficiaries.
According to Nesbitt’s own testimony, he never met with the respondents until 1984, and that meeting was ¿t their request. Crittenden’s unrefuted testimony shows that it was at these meetings that she began to raise the question of diversification, and that during 1986 she became increasingly concerned and continued to question him relative to diversification. It was during this time that IBM was underperforming the market. On April 29, 1987, the bank revised its trust department’s diversification policy to include a subsection entitled Large Concentrations of IBM Stock, calling for the careful scrutiny of portfolios containing large concentrations of IBM, specifically mentioning the Saxton account which was their No. 243. Finally, on August 7, 1987 there was a clear and documented repudiation of the IDA by Crittenden’s letter in which she explained her refusal to sign Nesbitt’s July 23rd offer for reaffirmation because she and her sister wanted a diversification plan. This letter w.as received by the bank on August 10, 1987, and in the court’s view should have galvanized the bank into action and an immediate diversification plan. Thus, these culminating events, the continuing underperformance of IBM compared to the Dow Jones, the change in the bank policy emphasizing special scrutiny on large concentra *691 tions of IBM, and the absolute repudiation by two of the three beneficiaries of the IDA, should have been sufficient impetus for any prudent trustee to immediately notify the beneficiaries of the Saxton trust that they were going to diversify and follow the basic investment policy of the bank. Although there was testimony that it should only take two or three days to diversify this portfolio, in the court’s view, for proper notification to the beneficiaries, analysis of the market for alternative investments, the stock should have been liquidated within 30 days of receipt of Crittenden’s letter, or by September 10th of 1987. For that reason the court selects that date by which 90% of the holdings in IBM should have been liquidated and the proceeds invested in other stocks, bonds, and fixed income securities. The selection of the sale of 90% of IBM stock held in the portfolio is based upon Nesbitt’s own testimony in which he acknowledged that the normal policy of the bank was only to keep 10% of a portfolio in any one stock issue. Following the formula delineated in Matter of Janes (90 NY2d 41, supra), the measure of the damages is the value of the lost capital. It is therefore the difference between the value of the stock, the date it should have been sold, here determined to be September 10, 1987, when the mean value was 1573/<i, less the value of the stock at the time it was delivered in kind to the respondents herein on July 1, 1993, at a value of 49V4, resulting in damages of $5,242,937. Added to this award is simple interest at 9% from September 10, 1987, to June 30, 1993, amounting to $2,739,434.52, for a total award of $7,982,371.52. From that total sum, however, must be deducted dividends after September 10, 1987, on the retained assets (Matter of Janes, supra; Matter of Garvin, 256 NY 518), which were $1,301,333.03 resulting in an award for damages in this case of $6,681,038.49. Upon that net amount, simple interest at 9% will continue from July 1, 1993, until payment.
The court rejects the bank’s contention that from any damages assessed there should be subtracted the capital gains tax that would have been generated by a liquidation of 90% of the IBM stock (see, Dobson v Commissioner of Internal Revenue, 320 US 489 [1943]; Matter of Janes, supra).
[5] Respondents also maintain that the bank be denied its commissions as trustee in this proceeding, citing Matter of Junkersfeld (244 App Div 260), In re Mattison’s Will (17 NYS2d 735), and Matter of Janes (supra). In Matter of Junkersfeld (supra), heretofore reviewed by the court on the question of estoppel and ratification, commissions were denied by the *692 Court without comment. In the Mattison case (supra), a surviving trustee was surcharged and commissions denied for the losses sustained when investing in securities not permitted by the restrictive language of the testamentary instrument. Here, once again, the varying factor between these cases and the case before bar, is the existence of the IDA. Again, however, in the court’s view, the bank cannot be protected from being penalized for its negligence in the administration of this trust by an instrument over 30 years old, particularly when considering the fact that the trust officer in the parent bank, before its execution admonished the bank that it should not rely on the IDA for an unreasonable length of time without a reaffirmation. Additionally, the bank failed to advise and recommend to the beneficiaries the bank’s own policy of diversification which indeed was a basic precept of sound financial management among the banking community. Not only was there a failure to recommend such prudence on the part of the bank, but essentially there was its abject refusal to listen to the pleas of the beneficiaries for submission of an adequate diversification plan. Therefore, this court denies commissions to the fiduciary in this proceeding.
Finally, the respondents seek the direction of this court that the bank’s attorneys’ fees should be charged to it and not. payable from the trust and that the bank be additionally surcharged for respondents’ attorneys’ fees and disbursements.
First, turning to the bank’s attorneys’ fees, it is a generally accepted principle that in a contested accounting where a trustee is found to have been imprudent, the trustee is disallowed payment from the trust of the trustee’s attorneys’ fees incurred in defending the objections (see, Matter of Newhoff, 107 AD2d 417; Matter of Janes, supra; Matter of Rothko, 84 Misc 2d 830, mod on other grounds 56 AD2d 499, affd 43 NY2d 305; Matter of Della Chiesa, 23 AD2d 562). Therefore, the attorneys for the petitioner must look to their client for all fees and disbursements incurred in defending the bank against the objections to the final account. As to the respondents’ attorneys’ fees, it is a general rule that a party is not entitled to recover attorneys’ fees from an opposing party even though the necessity of engaging in litigation was caused by the wrongful acts of the opposing party (see, Matter of Rothko, supra; Alyeska Pipeline Serv. Co. v Wilderness Socy., 421 US 240). It is true that the principal reason for the decline of the assets of this trust was the neglect and imprudence of the trustee, nevertheless the court has found no self-dealing or fraud on the part of *693 the fiduciary which is the case in most of the precedents cited by the respondents. Therefore, the court denies awarding respondents any counsel fees from the fiduciary.
In a recent article in the New York State Banking Journal by Charles F. Gibbs, entitled Corporate Fiduciaries, Diversification, and the Prudent Person Rule, Mr. Gibbs, after analyzing Matter of Janes (referred to there as Matter of Lincoln First Bank), concludes with several words of advice for the corporate fiduciary among which are that professional fiduciaries should make a thorough analysis of the investments that they hold, not only at the beginning but on a continuing basis. He further states that having a concentration in and of itself can be a hazard, and that corporate fiduciaries should ensure that their internal rules and protocols are being followed by their officers. Finally, he advises that beneficiaries should be given meaningful information and advice and not treated casually or ignored.
The bank in this case has throughout the five years of litigation attempted to thrust on the respondents the blame for the decline in the value of the Saxton trust. This bank, and the banking community at large, however, must recognize and understand, as did Mr. Fox from the Hanover Bank when he wrote to Roger Cooper back in 1959, that a professional fiduciary, or indeed, any fiduciary cannot permanently delegate its fiduciary responsibility and authority to the beneficiaries by means of an IDA.
A fiduciary must be as a watchman in the night, ever vigilant and always dedicated to the best interest of the cestui que trust.
[Portions of opinion omitted for purposes of publication.]