Millard L. Midonick, S.
In this proceeding for the suspension and ultimate removal of the executors, a temporary restraining order was requested (69 Mise 2d 752). By a prior order of this court dated June 26, 1972 the respondent executors and art galleries were restrained from selling or otherwise disposing of paintings executed by the testator. The restraining order permitted sales only upon application to the court on notice to the *321 attorneys for the parties. In the court’s opinion (N. Y. L. J., June 27,1972, p. 13, col. 1), a further hearing was scheduled for July 18,1972 and the suggestion was made that the parties come forward with a reasonable plan for the .sale of some 800 paintings executed by the testator, an artist of stature, which comprise the principal asset of this estate.
A hearing was had on July 18, at which time a workable plan for the disposition of some paintings pending the conclusion of this proceeding was not presented. Arguments were heard and the parties were granted further time to submit affidavits and memoranda of law. These papers now have been received. The immediate issue is whether or not the executors and the respondent galleries should be temporarily enjoined from selling paintings pursuant to contracts entered into by the executors. The facts that can be culled from the affidavits are herein related.
It appears that during his lifetime the testator, a modern painter of high reputation, had sold his paintings largely through Marlborough A. G-., a corporation formed under the laws of Lichtenstein, and, in fact, prior to his death had granted this gallery an exclusive agency to sell his works over a period of years. The contention is made that these contracts extended beyond the testator’s death although by their express terms the testator was obligated to deliver and the gallery was obligated to pay for only four paintings each year, the price to be 90% of the current selling price.
At his death the testator owned at least 800 paintings, some on canvas and others on paper, executed in various media. The executors under the testator’s will were Bernard J. Reis, a certified public accountant who had been employed by the testator as an accountant and also had acted as a friend and business advisor, Theodor Stamos, a fellow artist, and Morton Levine, a professor of anthropology. During the testator’s lifetime Reis, through his accounting firm, had been employed by Marlborough Gallery, Inc., a New York corporation, and by Marlborough A. G., both controlled by Frank Lloyd. It is asserted that at the date of the testator’s death Reis no longer was acting as accountant for the galleries but it is conceded that at such time he was an officer and director of the New York gallery. After the testator’s death Stamos entered into an agreement with Marlborough Gallery, Inc. providing that it act as his agent for the sale of his works of art.
Recognizing the advisability of liquidating the estate, the executors entered into negotiations with the respondents Marlborough Gallery, Inc. and Marlborough A. G. for the sale of paint *322 ings. It does not appear that any serious effort, or indeed any effort, was made to seek a different purchaser. While now claiming that no conflict of interest existed in a legal sense, Reis early realized that he was in an embarrassing position because of his connection with the prospective purchaser and he suggested that the negotiations be conducted by a lawyer without his assistance or advice. Purportedly this was done but, when two contracts had been negotiated, one for the outright sale of 100 paintings to Marlborough A. G. and a second for the consignment to Marlborough Gallery, Inc. of some 700 paintings for sale on a 50% commission basis, Reis approved the agreements and executed the contracts as an executor.
It is apparent that upon realization by Reis of his delicate position as an executor on the one hand and as an officer and director of one of the galleries on the other hand, the appropriate procedure would have been to submit the proposed contracts to this court for approval.
1 ‘ The rule has long been established that a trustee ‘ should not be allowed to become the purchaser of the trust property, because of the danger, in such a case, that the interests of the beneficiary might be prejudiced. ’ (Corbin v. Baker, 167 N. Y. 128,132; see Matter of Hubbell, 302 N. Y. 246; Matter of Fulton, 253 App. Div. 494; Davoue v. Fanning, 2 Johns. Ch. 252; see, also, Meinhard v. Salmon, 249 N. Y. 458, 464.) However, there is little danger of such prejudice if the transaction is subjected to prior judicial scrutiny and given court approval. Accordingly, the rule against self-dealing has not been applied, and does not apply, to interdict the purchase of trust property by a trustee where, the court, after conducting a full adversary hearing at which; all interested parties are represented, approves and authorizes the sale.” (Matter of Scarborough Props. Corp., 25 N Y 2d 553, 558-559).
Had such procedure been adopted, the executors would have obtained full legal protection either had the court approved the contracts after notice to the beneficiaries under the will or had the court disapproved the contracts by reason of opposition by such bneficiaries. Unfortunately this precaution was not taken and now the executors find themselves confronted with a charge of self-dealing.
“ The standard of loyalty in trust relations does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. Undivided loyalty is the supreme test, unlimited and unconfined by the *323 bounds of classified transactions.” (City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125,131).
Two of the executors, Reis and Stamos, assert that this is not a case of self-dealing. The third executor, Levine, assumes the position that the temporary restraining order should be continued in effect until the court has had an opportunity to review the agreements and that the transaction involves self-dealing on the part of Reis, and 1 ‘ potential conflict of interest of Stamos * * * (a noted painter) ” who “was considering entering into an agreement of his own with Marlborough ’ ’ which he later consummated.
Much is contained in the various affidavits as to the valuation of the paintings involved in the contract of sale and as to the allegedly excessive amount of commissions fixed in the consignment contract. Were an element of self-dealing absent from the transaction, the question of valuation and excessive commissions ordinarily would be disposed of in an accounting proceeding but, if self-dealing is present, immediate action by the court is required for the protection of the estate and questions of valuation and terms may not be a determining factor. “ [W]hen the trustee has a selfish interest which may be served, the law does not stop to inquire whether the trustee’s action or failure to act has been unfairly influenced. It stops the inquiry when the relation is disclosed and sets aside the transaction or refuses to enforce it, and in a proper case, surcharges the trustee as for an unauthorized investment. It is only by rigid adherence to these principles that all temptation can be removed from one acting as a fiduciary to serve his own interest when in conflict with the obligations of his trust.” (City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125, 132; see, also, Matter of People [Bond & Mtge. Guar. Co.], 303 N. Y. 423).
It is urged that the testator was fully aware of Reis ’ connection with the gallery at the time of the will’s execution and that from this knowledge an implication can be drawn that the testator implicitly approved self-dealing. The fact that a possibility of conflict of interest existed at the time of the appointment of executors was not a basis for denial of letters testamentary (Matter of Foss, 282 App. Div. 509) but the testator’s designation of Reis as an executor did not exempt the latter from the ordinary rules prohibiting self-dealing on the part of a fiduciary (Matter of Hubbell, 302 N. Y. 246). If the testator had any reason to anticipate that Reis would place himself in the awkward position of dealing with himself, the will’s silence in this regard did not permit Reis to avoid seeking the exoneration *324 which could have been obtained by a presentation of the facts to the' court before any commitment was made. We do not here have the fact situation which existed in Matter of Sherman (9 Misc 2d 731, affd. 279 App. Div. 981) where .the testator explicitly directed in his will that the executor perform stated business functions. Moreover, Reis could have avoided his dual role by terminating his association with the galleries. If his directorship of Marlborough commenced shortly before Rothko’s death,¡it did not exist at the time Rothko executed his will, nor did Reis’ salary from Marlborough commence until after Rothko’s death.
An effort is made to characterize this situation as not involving self-dealing, by comparing the position of Reis to that of a small minority corporate shareholder who has no impact upon the functioning of a corporation and comparatively little to gain financially from any particular transaction. It is true that Reis is not shown to be a shareholder in either gallery, but he is an officer and director of Marlborough Gallery, Inc. and in such capacity he has a voice in the management of the corporation and owes an obligation to the corporation to seek financial advantage for it. This obligation to the corporation, coupled with a possibility of enhancing his own position in the corporation structure, could impel a corporate director to seek every advantage for the company and would be in direct conflict with the obligation which a fiduciary owes to obtain the most advantages for the estate he represents.
It is stressed that Reis receives a comparatively small compensation from the gallery and the court will not suggest that he was prompted to enter into the challenged contracts in expectation of higher remuneration or any other monetary reward, but it is this very temptation that occasioned the rule against self-dealing.
“ It is not necessary that the trustee shall have gained from the transaction, in order to find that it is disloyal. If the dealing presented conflict of interest and consequent temptation to the trustee, it will be stricken down, at the option of the cestui, regardless of gain or loss ito the trustee.” (Bogert, Trusts and Trustees [2d ed.], § 543, p. 480).
The;fact that it was Reis who occupied the position of self-dealing does not excuse the other two executors who were parties to the contract, although a different remedy may be applied if at a trial different degrees of fault may be found (Wilmerding v. McKesson, 103 N. Y. 329, 341), assuming any wrongdoing at all will be found. In Matter of Durston (297 N. Y. 64, 72-73) it *325 was said: “It is contended by the executrix of the estate of Edward L. Robertson, who before his death was one of the trustees, that her testator’s estate is not subject to a surcharge because his action in approving the retention of shares of the Trust Company and the acquisition of additional shares was entirely disinterested and uninfluenced by any consideration other than the interest of the beneficiaries. That was true, but it is not questioned that he gave his approval to the retention of the .shares of the Trust Company held by the testator and to the acquisition of additional shares as well. Under these circumstances his liability as a cotrustee concurring in and approving illegal investments may not be avoided because he was personally uninfluenced by the conflicting interests to which his cotrustees were subjected. The basis of his liability is found in his approval of and acquiescence in such investments which resulted in loss to the beneficiaries. When a cotrustee approves a prohibited investment and such losses result, his liability is clear.”
The conclusion is that the appearance of self-dealing is so strong in this case that the court could not permit performance under the contracts without judicial supervision and permission at this time. The court is not prepared to invalidate the contracts without affording the parties a full hearing, but the situation is one which calls for relief and, accordingly, the existing restraint will be continued subject to the conditions and modifications set forth below. The protection of the estate warrants this, and at the hearing on July 18 the respondent galleries were not able to state ¡that the sale of a particular painting had been either lost or prejudiced by the restraint which then had been in effect for some weeks. It is to the advantage of all parties that they avail themselves of an early hearing of .this matter at which all facts may be disclosed.
At page 60 of the reply memorandum on behalf of executors Reis and Stamos, it is emphasized that the only experts ‘1 who examined the paintings and ’ ’ are ‘ ‘ therefore competent to express an opinion as to their fair market value in May 1970 ” are experts either chosen by Reis and Stamos, or are Reis and Stamos themselves, or is Frank Lloyd who is said to control both respondent galleries.
Whatever the plenary trial will reveal by way of exoneration or fault of the executors and other respondents, without a preliminary injunction there may be no meaningful trial; sale of 800 paintings or any paintings about the world markets may place them beyond the reach of all expert witnesses except those of *326 respondents who had possession. The preliminary injunction, which will issue, will not be inflexible; upon opportunity of inspection and approval of terms, any painting may be released from restraint after hearing by this court on such terms as justice appears. Eight hundred paintings, unlike a parcel of real property or shares of stock, cannot be inspected after multiple sales about the various art centers of the world. Without the injunction which may be thus subject to revocation, petitioning children of the testator and the Attorney-General will .suffer the irreparable harm of not ever having had access to prepare for a meaningful judicial hearing.
Accordingly, pending trial, liquidation may proceed, .subject to approval by the court, on two-days ’ notice to all counsel as to the terms of sale of any painting or paintings; and even before such notice of hearing, subject also to advance opportunity by notice in writing from the galleries of availability of specified paintings to be freed for sale (or of all paintings controlled by the galleries), to afford all parties an opportunity before such presale hearings, to inspect, measure, photograph and document such paintings by experts of their own choosing, so that the evidence will not be lost by sales before trial. The number of days of notice by the galleries to other counsel, and the conditions and places for such disclosure and documentation before such notices of hearings shall be reasonable, and shall be provided in the order to be made herein. Alternative provisions, depending upon the number of paintings involved in a particular sale may be necessary. Presumably more time will be required to inspect and document 800 paintings scattered in various places than a dozen paintings in one place.
Concerning the able presentation by the attorneys for the executors, Eeis and Stamos, and for the galleries, objecting to a temporary injunction because of the money damage aspect of the relief sought, they urge that money damages will be an adequate remedy obviating the drastic remedy of temporary injunction. The joint reply brief of the respondent galleries cites Carmody-Wait 2d (vol. 12, § 78:59), to the effect that a showing of irreparable damage is essential to the issuance of an injunction, not merely money damages. Such irreparable damage has been amply demonstrated in this proceeding by highly conflicting estimates of the value of the testator’s paintings with differentials of millions of dollars, and the fact that, in order to establish a basis for valuation, the procedure of identification ánd adversary inspection of each painting by size, medium, photograph and full description has not been accomplished or, *327 if anything of this nature has been done, it has not been disclosed in the papers submitted to this court. The opinions of petitioners’ and Attorney-General’s experts, and other experts who are not parties, which have been submitted appear to have been based upon the general reputation of the testator as a painter rather than upon an actual physical examination and documentation of the paintings involved. This may be some explanation of the great variances among these appraisals but it is to the interest of the estate and its beneficiaries that a precise description and inspection of each painting be accomplished by experts chosen by each party, as a practical method for any evaluation.
If it shall be established upon proper appraisal based upon adversary examination of the paintings that ithe executors have undervalued such assets, and have engaged in disloyal self-dealing as alleged by the petitioners, there is no assurance that the respondents can respond in damages, particularly as one respondent is a European corporation.
From the presentation thus far, the issues for plenary trial appear to be: (A) have the executors with the galleries engaged in disloyal self-dealing; (B) should the agreements be set aside; (C) what, if any, damage has the estate suffered and how can it be indemnified; (D) should the executors be removed, suspended or otherwise controlled and dealt with? The temporary injunction should preserve the status quo by ensuring that all options for final relief are reasonably preserved for the court if needed after trial.
The galleries quote from Carmody-Wait 2d (vol. 12, § 78:59) the following: ‘ ‘ An important factor from the aspect of necessity for the injunctive order is whether, .should the order not issue, the plaintiff, though successful, will be exposed to irreparable injury before a judgment in his favor becomes effective, hence the plaintiff’s showing must demonstrate both the nature and extent of the danger. Mere conclusions, as differentiated from evidentiary facts, are insufficient. Thus, a declaration that irreparable harm will ensue to plaintiff unless his motion is granted, being a mere conclusion, is not enough; and even allegations that defendant is insolvent and unable to respond in damages, or that the property involved has no ascertainable value and that loss of it could not therefore be compensated for in damages, have been regarded as insufficient. ’ ’ In support of the quoted statement that insolvency, inability to respond in damages and the fact that the property has no ascertained value, are elements constituting insufficient grounds for injunc *328 tive relief, a single case (Howley v. Press, 127 App. Div. 646) is cited in Carmody-Wait 2d. The opinion in that case is not authority for the quoted statement since the opinion reads (p. 647): “ But the papers upon which ithe injunction was granted do not show any ground for injunctive relief. There is no allegation that the def endant is insolvent and unable to respond in damages, or that the property threatened to be sold does not have an ascertainable value.” (emphasis added).
An appropriate quotation appears in Pomeroy’s Equity Jurisprudence (vol. 4, p. 938 [5th ed., 1941]) where it is said: “ It may therefore be stated as a general proposition, that whenever the equitable relief against mistake or fraud with respect to specific property, or the equitable remedy of enforcing trusts or fiduciary duties concerning specific property, or of enforcing any other equitable estates, interests, or claims in or to specific property, requires the aid of an injunction, a court of equity has jurisdiction, and will exercise that jurisdiction, to grant an injunction, either pending the suit or as a part of the final decree, to restrain a breach of trust or of fiduciary duty, or to restrain an alienation, .transfer, assignment, encumbrance, or other kind of dealing with the property, which would be in violation of the trust or fiduciary duty, or in fraud of the complainant’s rights, and which would therefore interfere with and prejudice the ultimate remedies to which he may be entitled with respect to such property. The particular instances to which this doctrine is applied are almost numberless, and extend through the entire range of equitable remedies against mistake and fraud, or to enforce trusts and fiduciary duties, or to establish and enforce other equitable estates, interests, liens, and primary rights in and to specific property of any kind or form.”
CPLR 6312 (subd. [b]) requires that the party seeking injunctive relief provide an undertaking to ensure the payment of damages and costs that may be sustained by reason of the injunction. At the date of the hearing in July, the respondents were unable to state that the then existing restraining order had affected a single sale of a painting. The temporary restraining order permits application to be made .to the court for the approval of a .sale were opportunity to effect a sale to arise, but ¡such an application has not been made. Since the injunction to be issued does not preclude sales of paintings on reasonable terms, it is difficult to see how substantial damage to the objecting respondents can result.
The petitioners in this proceeding who seek the injunctive relief are the children of the testator. They have elected to *329 share in the estate by operation of EPTL 5-3.3 and their elections have been determined to be valid (71 Misc 2d 74). As a consequence, these children have substantial financial interests in the hands of ithe executors which may be resorted to for the protection not only of the respondent executors but also for the protection of the galleries. Marlborough Galleries, Inc. have several hundred paintings on consignment on a commission basis and the possession of these paintings affords this respondent ample security for any damage it would suffer.
Accordingly an undertaking in an amount approaching any of the conflicting expressions as to the value of the paintings is not required. An undertaking in the amount of $20,000 will meet the statutory requirement and will be directed.