OPINION OF THE COURT
Cooke, J.
Mark Rothko, an abstract expressionist painter whose works through the years gained for him an international reputation of greatness, died testate on February 25, 1970. The principal asset of his estate consisted of 798 paintings of tremendous value, and the dispute underlying this appeal involves the conduct of his three executors in their disposition of these works of art. In sum, that conduct as portrayed in the record and sketched in the opinions was manifestly wrongful and indeed shocking.
Rothkos’ will was admitted to probate on April 27, 1970 and letters testamentary were issued to Bernard J. Reis, Theodores Stamos and Morton Levine. Hastily and within a period of only about three weeks and by virtue of two contracts each dated May 21, 1970, the executors dealt with all 798 paintings.
By a contract of sale, the estate executors agreed to sell to Marlborough AG., a Liechtenstein corporation (hereinafter MAG), 100 Rothko paintings as listed for $1,800,000, $200,000 to be paid on execution of the agreement and the balance of $1,600,000 in 12 equal interest-free installments over a 12-year period. Under the second agreement, the executors consigned to Marlborough Gallery, Inc., a domestic corporation (hereinafter MNY), "approximately 700 paintings listed on a Schedule to be prepared”, the consignee to be responsible for costs covering items such as insurance, storage restoration and promotion. By its provisos, MNY could sell up to 35 paintings a year from each of two groups, pre-1947 and post- *315 1947, for 12 years at the best price obtainable but not less than the appraised estate value, and it would receive a 50% commission on each painting sold, except for a commission of 40% on those sold to or through other dealers.
Petitioner Kate Rothko, decedent’s daughter and a person entitled to share in his estate by virtue of an election under EPTL 5-3.3, instituted this proceeding to remove the executors, to enjoin MNY and MAG from disposing of the paintings, to rescind the aforesaid agreements between the executors and said corporations, for a return of the paintings still in possession of those corporations, and for damages. She was joined by the guardian of her brother Christopher Rothko, likewise interested in the estate, who answered by adopting the allegations of his sister’s petition and by demanding the same relief. The Attorney-General of the State, as the representative of the ultimate beneficiaries of the Mark Rothko Foundation, Inc., a charitable corporation and the residuary legatee under decedent’s will, joined in requesting relief substantially similar to that prayed for by petitioner. On June 26, 1972 the Surrogate issued a temporary restraining order and on September 26, 1972 a preliminary injunction enjoining MAG, MNY, and the three executors from selling or otherwise disposing of the paintings referred to in the agreements dated May 21, 1970, except for sales or dispositions made with court permission. The Appellate Division modified the preliminary injunction order by increasing the amount of the bond and otherwise affirmed. By a 1974 petition, the Attorney-General, on behalf of the ultimate charitable beneficiaries of the Mark Rothko Foundation, sought the punishment of MNY, MAG, Lloyd and Reis for contempt and other relief.
Following a nonjury trial covering 89 days and in a thorough opinion, the Surrogate found: that Reis was a director, secretary and treasurer of MNY, the consignee art gallery, in addition to being a coexecutor of the estate; that the testator had a 1969 inter vivos contract with MNY to sell Rothko’s work at a commission of only 10% and whether that agreement survived testator’s death was a problem that a fiduciary in a dual position could not have impartially faced; that Reis was in a position of serious conflict of interest with respect to the contracts of May 21, 1970 and that his dual role and planned purpose benefited the Marlborough interests to the detriment of the estate; that it was to the advantage of coexecutor Stamos as a "not-too-successful artist, financially”, *316 to curry favor with Marlborough and that the contract made by him with MNY within months after signing the estate contracts placed him in a position where his personal interests conflicted with those of the estate, especially leading to lax contract enforcement efforts by Stamos; that Stamos acted negligently and improvidently in view of his own knowledge of the conflict of interest of Reis; that the third coexecutor, Levine, while not acting in self-interest or with bad faith, nonetheless failed to exercise ordinary prudence in the performance of his assumed fiduciary obligations since he was aware of Reis’ divided loyalty, believed that Stamos was also seeking personal advantage, possessed personal opinions as to the value of the paintings and yet followed the leadership of his coexecutors without investigation of essential facts or consultation with competent and disinterested appraisers, and that the business transactions of the two Marlborough corporations were admittedly controlled and directed by Francis K. Lloyd. It was concluded that the acts and failures of the three executors were clearly improper to such a substantial extent as to mandate their removal under SCPA 711 as estate fiduciaries. The Surrogate also found that MNY, MAG and Lloyd were guilty of contempt in shipping, disposing of and selling 57 paintings in violation of the temporary restraining order dated June 26, 1972 and of the injunction dated September 26, 1972; that the contracts for sale and consigment of paintings between the executors and MNY and MAG provided inadequate value to the estate, amounting to a lack of mutuality and fairness resulting from conflicts on the part of Reis and Stamos and improvidence on the part of all executors; that said contracts were voidable and were set aside by reason of violation of the duty of loyalty and improvidence of the executors, knowingly participated in and induced by MNY and MAG; that the fact that these agreements were voidable did not revive the 1969 inter vivos agreements since the parties by their conduct evinced an intent to abandon and abrogate these compacts. The Surrogate held that the present value at the time of trial of the paintings sold is the proper measure of damages as to MNY, MAG, Lloyd, Reis and Stamos. He imposed a civil fine of $3,332,000 upon MNY, MAG and Lloyd, same being the appreciated value at the time of trial of the 57 paintings sold in violation of the temporary restraining order and injunction.[1] It was held that Levine was *317 liable for $6,464,880 in damages, as he was not in a dual position acting for his own interest and was thus liable only for the actual value of paintings sold MNY and MAG as of the dates of sale, and that Reis, Stamos, MNY and MAG, apart from being jointly and severally liable for the same damages as Levine for negligence, were liable for the greater sum of $9,252,000 "as appreciation damages less amounts previously paid to the estate with regard to sales of paintings.” The cross petition of the Attorney-General to reopen the record for submission of newly discovered documentary evidence was denied. The liabilities were held to be congruent so that payment of the highest sum would satisfy all lesser liabilities including the civil fines and the liabilities for damages were to be reduced by payment of the fine levied or by return of any of the 57 paintings disposed of, the new fiduciary to have the option in the first instance to specify which paintings the fiduciary would accept.
The Appellate Division, in an opinion by Justice Lane, modified to the extent of deleting the option given the new fiduciary to specify which paintings he would accept. Except for this modification, the majority affirmed on the opinion of Surrogate Midonick, with additional comments. Among others, it was stated that the entire court agreed that executors Reis and Stamos had a conflict of interest and divided loyalty in view of their nexus to MNY and that a majority were in agreement with the Surrogate’s assessment of liability as to executor Levine and his findings of liability against MNY, MAG and Lloyd. The majority agreed with the Surrogate’s analysis awarding "appreciation damages” and found further support for his rationale in Menzel v List (24 NY2d 91). Justice Kupferman, in an opinion styled "concurring in part and dissenting in part”, stated that, although he had "expressed reservations with respect to various factors to be considered in the calculation of damages”, he concurred "in the basic conclusion and, therefore, in order to resolve the matter for the purpose of appeal” voted to modify as per the Lane opinion (56 AD2d 499, 505-506). Justices Capozzoli and Nunez, in separate dissenting in part opinions, viewed Menzel v List as inapplicable and voted to modify and remit to determine the reasonable value of the paintings as of May, *318 1970, when estate contracts with MNY and MAG had their inception in writing.
Since the Surrogate’s findings of fact as to the conduct of Reis, Stamos, Levine, MNY, MAG and Lloyd and the value of the paintings at different junctures were affirmed by the Appellate Division, if there was evidence to support these findings they are not subject to question in this court and the review here is confined to the legal issues raised (CPLR 5501, subd [b]; Simon v Electrospace Corp., 28 NY2d 136, 139; Matter of City of New York [Fifth Ave. Coach Lines], 22 NY2d 613, 620-621).
In seeking a reversal, it is urged that an improper legal standard was applied in voiding the estate contracts of May, 1970, that the "no further inquiry” rule applies only to self-dealing and that in case of a conflict of interest, absent self-dealing, a challenged transaction must be shown to be unfair. The subject of fairness of the contracts is intertwined with the issue of whether Reis and Stamos were guilty of conflicts of interest.[2] Scott is quoted to the effect that "[a] trustee does not necessarily incur liability merely because he has an individual interest in the transaction * * * In Bullivant v. First Nat. Bank [246 Mass 324] it was held that * * * the fact that the bank was also a creditor of the corporation did not make its assent invalid, if it acted in good faith and the plan was fair” (2 Scott, Trusts, § 170.24, p 1384 [emphasis added]), and our attention has been called to the statement in Phelan v Middle States Oil Corp. (220 F2d 593, 603, cert den sub nom. Cohen v Glass, 349 US 929) that Judge Learned Hand found "no decisions that have applied [the no further inquiry rule] inflexibly to every occasion in which the fiduciary has been shown to have had a personal interest that might in fact have conflicted with his loyalty”.
These contentions should be rejected. First, a review of the opinions of the Surrogate and the Appellate Division manifests that they did not rely solely on a "no further inquiry rule”, and secondly, there is more than an adequate *319 basis to conclude that the agreements between the Marlborough corporations and the estate were neither fair nor in the best interests of the estate. This is demonstrated, for example, by the comments of the Surrogate concerning the commissions on the consignment of the 698 paintings (see 84 Misc 2d 830, 852-853) and those of the Appellate Division concerning the sale of the 100 paintings (see 56 AD2d, at pp 501-502). The opinions under review demonstrate that neither the Surrogate nor the Appellate Division set aside the contracts by merely applying the no further inquiry rule without regard to fairness. Rather they determined, quite properly indeed, that these agreements were neither fair nor in the best interests of the estate.
 To be sure, the assertions that there were no conflicts of interest on the part of Reis or Stamos indulge in sheer fantasy. Besides being a director and officer of MNY, for which there was financial remuneration, however slight, Reis, as noted by the Surrogate, had different inducements to favor the Marlborough interests, including his own aggrandizement of status and financial advantage through sales of almost one million dollars for items from his own and his family’s extensive private art collection by the Marlborough interests (see 84 Misc 2d, at pp 843-844). Similarly, Stamos benefited as an artist under contract with Marlborough and, interestingly, Marlborough purchased a Stamos painting from a third party for $4,000 during the week in May, 1970 when the estate contract negotiations were pending (see 84 Misc 2d, at p 845). The conflicts are manifest. Further, as noted in Bogert, Trusts and Trustees (2d ed), "The duty of loyalty imposed on the fiduciary prevents him from accepting employment from a third party who is entering into a business transaction with the trust” (§ 543, subd [S], p 573). "While he [a trustee] is administering the trust he must refrain from placing himself in a position where his personal interest or that of a third person does or may conflict with the interest of the beneficiaries” (Bogert, Trusts [Hornbook Series—5th ed], p 343). Here, Reis was employed and Stamos benefited in a manner contemplated by Bogert (see, also, Meinhard v Salmon, 249 NY 458, 464, 466-467; Schmidt v Chambers, 265 Md 9, 33-38). In short, one must strain the law rather than follow it to reach the result suggested on behalf of Reis and Stamos.
Levine contends that, having acted prudently and upon the advice of counsel, a complete defense was established. *320 Suffice it to say, an executor who knows that his coexecutor is committing breaches of trust and not only fails to exert efforts directed towards prevention but accedes to them is legally accountable even though he was acting on the advice of counsel (Matter of Westerñeld, 32 App Div 324, 344; 3 Scott, Trusts [3d ed], § 201, p 1657). When confronted with the question of whether to enter into the Marlborough contracts, Levine was acting in a business capacity, not a legal one, in which he was required as an executor primarily to employ such diligence and prudence to the care and management of the estate assets and affairs as would prudent persons of discretion and intelligence (King v Talbot, 40 NY 76, 85-86), accented by "[n]ot honesty alone, but the punctilio of an honor the most sensitive” (Meinhard v Salmon, 249 NY 458, 464, supra). Alleged good faith on the part of a fiduciary forgetful of his duty is not enough (Wendt v Fischer, 243 NY 439, 443). He could not close his eyes, remain passive or move with unconcern in the face of the obvious loss to be visited upon the estate by participation in those business arrangements and then shelter himself behind the claimed counsel of an attorney (see Matter of Niles, 113 NY 547, 558; Matter of Huntley, 13 Misc 375, 380; 3 Warren’s Heaton, Surrogates’ Courts [6th ed], § 217, subd 3, par [b]).
Further, there is no merit to the argument that MNY and MAG lacked notice of the breach of trust. The record amply supports the determination that they are chargeable with notice of the executors’ breach of duty.
The measure of damages was the issue that divided the Appellate Division (see 56 AD2d, at p 500). The contention of Reis, Stamos, MNY and MAG, that the award of appreciation damages was legally erroneous and impermissible, is based on a principle that an executor authorized to sell is not liable for an increase in value if the breach consists only in selling for a figure less than that for which the executor should have sold. For example, Scott states:
"The beneficiaries are not entitled to the value of the property at the time of the decree if it was not the duty of the trustee to retain the property in the trust and the breach of trust consisted merely in selling the property for too low a price” (3 Scott, Trusts [3d ed], § 208.3, p 1687 [emphasis added]).
"If the trustee is guilty of a breach of trust in selling trust property for an inadequate price, he is liable for the difference *321 between the amount he should have received and the amount which he did receive. He is not liable, however, for any subsequent rise in value of the property sold”. (Id., § 208.6, pp 1689-1690.)
A recitation of similar import appears in Comment d under Restatement, Trusts 2d (§ 205): "d. Sale for less than value. If the trustee is authorized to sell trust property, but in breach of trust he sells it for less than he should receive, he is liable for the value of the property at the time of the sale less the amount which he received. If the breach of trust consists only in selling it for too little, he is not chargeable with the amount of any subsequent increase in value of the property under the rule stated in Clause (c), as he would be if he were not authorized to sell the property. See § 208.” (Emphasis added.) However, employment of "merely” and "only” as limiting words suggests that where the breach consists of some misfeasance, other than solely for selling "for too low a price” or "for too little”, appreciation damages may be appropriate. Under Scott (§ 208.3, pp 1686-1687) and the Restatement (§ 208), the trustee may be held liable for appreciation damages if it was his or her duty to retain the property, the theory being that the beneficiaries are entitled to be placed in the same position they would have been in had the breach not consisted of a sale of property that should have been retained. The same rule should apply where the breach of trust consists of a serious conflict of interest—which is more than merely selling for too little.
The reason for allowing appreciation damages, where there is a duty to retain, and only date of sale damages, where there is authorization to sell, is policy oriented. If a trustee authorized to sell were subjected to a greater measure of damages he might be reluctant to sell (in which event he might run a risk if depreciation ensued). On the other hand, if there is a duty to retain and the trustee sells there is no policy reason to protect the trustee; he has not simply acted imprudently, he has violated an integral condition of the trust.
"If a trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, and the transferee has disposed of the property * * * [i]t seems proper to charge him with the value at the time of the decree, since if it had not been for the breach of trust the property would still have been a part of the trust estate” (4 Scott, *322 Trusts [3d ed], § 291.2; see, also, United States v Dunn, 268 US 121, 132). This rule of law which applies to the transferees MNY and MAG also supports the imposition of appreciation damages against Reis and Stamos, since if the Marlborough corporations are liable for such damages either as purchaser or consignees with notice, from one in breach of trust, it is only logical to hold that said executors, as sellers and consignors, are liable also pro tanto.
Contrary to assertions of appellants and the dissenters at the Appellate Division, Menzel v List (24 NY2d 91, supra) is authority for the allowance of appreciation damages. There, the damages involved a breach of warranty of title to a painting which at one time had been stolen from plaintiff and her husband and ultimately sold to defendant. Here, the executors, though authorized to sell, did not merely err in the amount they accepted but sold to one with whom Reis and Stamos had a self-interest. To make the injured party whole, in both instances the quantum of damages should be the same. In other words, since the paintings cannot be returned, the estate is therefore entitled to their value at the time of the decree, i.e., appreciation damages. These are not punitive damages in a true sense, rather they are damages intended to make the estate whole. Of course, as to Reis, Stamos, MNY and MAG, these damages might be considered by some to be exemplary in a sense, in that they serve as a warning to others (see Reynolds v Pegler, 123 F Supp 36, 38, affd 223 F2d 429, cert den 350 US 846), but their true character is ascertained when viewed in the light of overriding policy considerations and in the realization that the sale and consignment were not merely sales below value but inherently wrongful transfers which should allow the owner to be made whole (see Menzel v List, 24 NY2d 91, 97, supra; see, also, Simon v Electrospace Corp., 28 NY2d 136, 144, supra).
The decree of the Surrogate imposed appreciation damages against Reis, Stamos, MNY and MAG in the amount of $7,339,464.72—computed as $9,252,000 (86 works on canvas at $90,000 each and 54 works on paper at $28,000 each) less the aggregate amounts paid the estate under the two rescinded agreements and interest. Appellants chose not to offer evidence of "present value” and the only proof furnished on the subject was that of the expert Heller whose appraisal as of January, 1974 (the month previous to that when trial commenced) on a painting-by-painting basis totaled $15,100,000. *323 There was also testimony as to bona fide sales of other Rothkos between 1971 and 1974. Under the circumstances, it was impossible to appraise the value of the unreturned works of art with an absolute certainty and, so long as the figure arrived at had a reasonable basis of computation and was not merely speculative, possible or imaginary, the Surrogate had the right to resort to reasonable conjectures and probable estimates and to make the best approximation possible through the exercise of good judgment and common sense in arriving at that amount (see Story Parchment Co. v Paterson Co., 282 US 555, 562-563; Eastman Co. v Southern Photo Co., 273 US 359, 379; Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205, 209-210; Alexander’s Dept. Stores v Ohrbach’s, 269 App Div 321, 328-329; Sutcliffe v Potts, 88 NYS2d 55, 57, affd 277 App Div 751; cf. Sheldon v Metro-Goldwyn Pictures Corp., 106 F2d 45, 51 [L. Hand, J.]). This is particularly so where the conduct of wrongdoers has rendered it difficult to ascertain the damages suffered with the precision otherwise possible (Story Parchment Co. v Paterson Co., supra, at p 563; Eastman Co. v Southern Photo Co., supra, at p 379). Significantly, the Surrogate’s factual finding as to the present value of these unreturned paintings was affirmed by the Appellate Division and, since that finding had support in the record and was not legally erroneous, it should not now be subjected to our disturbance.
On February 21, 1969, decedent made a contract with MAG which provided that "Mark Rothko agrees not to sell any works of art for a period of eight years, except to Marlborough A.G. if a supplementary contract is made.” A supplementary contract made that same day recited that "Mark Rothko has the option to sell to Marlborough A.G. an additional four paintings each year at prices not below Marlborough A.G.’s then current selling prices, the price to be paid being [90%] of the current selling prices.” The Surrogate reasoned that the fact that the 1970 agreements for the sale and consignment of paintings were voidable because of self-dealing did not revive the 1969 inter vivos agreements and found that the parties by their conduct intended to abandon and abrogate these 1969 agreements. In turn and in effect, the Appellate Division agreed with this finding of abandonment (56 AD2d, at p 501). "A voidable contract is one where one or more parties thereto have the power, by a manifestation of election to do so, to avoid the legal relations created by the *324 contract; or by ratification of the contract to extinguish the power of avoidance” (Restatement, Contracts, § 13). Where a contract is voidable on both sides, as where there has been a violation of the duty of loyalty and improvidence by executors knowingly participated in and induced by the other contracting parties (see 84 Misc 2d, at p 858), the transaction is not wholly void, since in order to prevent the contract from having its normal operation the claim or defense must in some manner be asserted and also since the contract is capable of ratification, such a contract affects from the outset the legal relations of the parties (1 Williston, Contracts [3d ed], § 15, pp 28-29). The question of whether there has been an abandonment or abrogation of a contract is usually one of fact (see Green v Doniger, 300 NY 238, 245) and the circumstances disclosed by the record, including a showing of the new agreements in 1970, contained a sufficient basis for the finding of the abandonment or abrogation of those which came into being in 1969 (see Schwartzreich v Bauman-Basch, 231 NY 196, 203).
The Marlborough corporations and Lloyd contend that there was no violation of either the temporary restraining order or the preliminary injunction by the delivery of paintings sold prior to the court’s restraints and that, therefore, the finding of contempt was erroneous. The Attorney-General in response contends that the "group” sales did not pass equitable ownership and that even if the invoices had been typed prior to said order and injunction no sale took place until after the injunction. In support of the latter position, the Uniform Commercial Code (§ 2-106, subd [1]; §§ 2-307, 2-401, subds [2], [3]) is cited for the proposition that as a matter of law the questioned sales took place on delivery to the purchasers which in all instances occurred after the injunction, the latter of the two court restraints. MNY, MAG and Lloyd counter with the argument that, under art market custom, invoices of paintings are sales and that the restraining order and preliminary injunction failed to clearly state what acts were prohibited. In any event, the plain and simple import of both the order and the injunction—not to sell or otherwise dispose of the paintings (cf. Matter of Black, 138 App Div 562, 565)—was violated by dispositions of them. Consequently, it is immaterial how the applicable Uniform Commercial Code provisions might be interpreted. If MNY, MAG and Lloyd had *325 invoiced paintings and were acting in good faith, they would have advised the court of their prior commitments.
We have considered the other alleged errors urged by the parties, and find those arguments to be without merit. In short, we find no basis for disturbing the result reached below.
Accordingly, the order of the Appellate Division should be affirmed, with costs to the prevailing parties against appellants, and the question certified answered in the affirmative.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed, etc.

. The decree of the Surrogate’s Court, New York County, dated January 15, 1976, *317 was amended in this respect pursuant to an order filed April 28, 1976 by substituting "63” for "57” as the number of paintings sold and disposed of and "$3,872,000” as the amount of the fine instead of "$3,332,000”.

. In New York, an executor, as such, takes a qualified legal title to all personalty specifically bequeathed and an unqualified legal title to that not so bequeathed; he ' holds not in his own right but as a trustee for the benefit of creditors, those entitled to receive under the will and, if all is not bequeathed, those entitled to distribution under the EPTL (Blood v Kane, 130 NY 514, 517; see Bischoff v Yorkville Bank, 218 NY 106, 110-111; Bankers Sur. Co. v Meyer, 205 NY 219, 223-224; but see Restatement, Trusts 2d, § 6; Bogert, Trusts [Hornbook Series—5th ed], p 31).