OPINION OF THE COURT
Millard L. Midonick, S.
This is an application by Kate Rothko Prizel, as administratrix, c. t. a., of the estate of Mark Rothko, deceased, for instructions as to the percentage of the estate to be distributed to the Mark Rothko Foundation, Inc., as charitable beneficiary, pursuant to EPTL 5-3.3. The petitioner seeks a construction of EPTL 5-3.3 and instructions as to how to compute whatever such percentage share of the estate to which the Mark Rothko Foundation, Inc., hereinafter called the Foundation, is entitled.
In addition, petitioner seeks a determination of whether certain expenses for legal and other services may be charged to the estate as a whole and thereby in effect be deducted on a pro rata basis from the Foundation’s percentage share.
The decedent Mark Rothko, a world-renowned artist, died on February 25, 1970, leaving an estate which consisted primarily but not entirely of 798 of his paintings. He was survived by his wife, Mary Alice Rothko, and by his two children, Kate Rothko and Christopher Rothko, both then minors. His will, admitted to probate on March 27, 1970, *720 contained specific bequests and one general bequest. The bulk of the estate was bequeathed to the Foundation under the will’s residuary clause, which provided in relevant part as follows: "sixth: All the rest, residue and remainder of my property, I give and bequeath to the mark rothko foundation”.
By notices dated July 30, 1970, the two children, as the testator’s surviving issue, made a timely election under EPTL 5-3.3 to contest the gift to the charity as excessive. EPTL 5-3.3 provides, in relevant part, as follows: "(a) A person may make a testamentary disposition of his entire estate to any person for a benevolent, charitable, educational, literary, scientific, religious or missionary purpose, provided that if any such disposition is contested by the testator’s surviving issue or parents, it shall be valid only to the extent of one-half of such testator’s estate, wherever situated, after the payment of debts”.
By decision dated August 31, 1972 (Matter of Rothko, 71 Misc 2d 74, affd 43 AD2d 819) and decree entered January 5, 1973, this court sustained the validity of the children’s election. The decree did not fix the precise amounts to be received by each beneficiary, but rather provided "that the exact amounts of the respective shares of Kate Rothko and Christopher Rothko shall be fixed and determined in the decree to be entered settling the final account of proceedings of the executors of Mark Rothko’s will or in such other manner as this court may direct.”
Since the death of the decedent, the value of the estate has risen substantially. This is primarily attributable to the increase in the value of the paintings following the death of the decedent, a noted artist.
The Foundation and the Attorney-General (as representative of the ultimate charitable beneficiaries) have taken the position that the Foundation’s one-half interest in the estate is not determined as of date of death but as of current date of distribution of the assets, and that the Foundation is thereby entitled to its pro rata portion of the appreciation in the value of the estate after the date of death. Kate Rothko and Barbara Northrup, as guardian of Christopher Rothko, still a minor, have taken the position that the Foundation’s one-half interest is determined as of date of death and not as of date of distribution, and that the substantial increment in the estate’s value belongs solely to the two individual beneficiaries. The *721 Foundation also has taken the position that under New York law, its one-half interest in the estate is to be determined prior to the deduction of legal expenses incurred in preserving and adding to the assets of the estate since the date of death, these not being "debts” but instead administration expenses.
The decedent’s children concede that if the value of the Foundation’s interest in the estate is determined as of date of death, which they claim is required by the proper interpretation of ETPL 5-3.3, then the Foundation should not pay any portion of the legal expenses, since it will not have benefited from such legal services; but the children urge that if the Foundation’s share is determined as of the current date of distribution, then the legal expenses, and all administration expenses, past and future, should be considered in determining said share.
EPTL 5-3.3 was derived from section 17 of the Decedent Estate Law. Early decisions interpreting section 17 of the Decedent Estate Law held that gifts to charities were converted into general legacies for a fixed sum. This was the case in both Matter of Brooklyn Trust Co. (179 App Div 262) in which a residuary estate was left to charities, and in Matter of Seymour (239 NY 259) which involved a remainder estate bequeathed to charity. However, the court in Seymour made clear that it was dealing with a case where payment of the charitable legacy was postponed by the terms of the will for an intervening life estate, and that it was not dealing with a situation involving payment of a legacy not postponed by the terms of the will but which might nevertheless be held by the estate for more than the stautory period (then one year), where the increase in value might be attributable in part to what was held for more than one year. The court indicated that the result might be different in the latter case.
"We have not before us a case where the amount which the [charitable] corporation is to receive is fixed and is presently payable but where for one reason or another it has not been paid within the year after the testator’s death, and where the executors so used the estate in their hands, including the part to which the corporation is entitled, so as to increase its value. We do not decide that under such circumstances the corporation might not share in the increase caused in part by the use of its funds.” (Matter of Seymour, supra, p 263; emphasis added.)
In 1949, the Court of Appeals decided Matter of Mayers (299 *722 NY 388) and in essence abandoned the general legacy rationale of Seymour and Brooklyn Trust. The facts and issue in Mayers were essentially the same as in Seymour; i.e., the residue of the estate was left in trust for certain life beneficiaries, with the remainder to charity. The court in Mayers decreed that, first, the amount of the remainder to go to charity and the amount of the remainder to go to other distributees was to be determined by using the present value of the remainder at date of death, and that upon distribution of the remainder by the trustees after termination of the life estates, the trust assets were to be distributed in the same ratio. Therefore, if 80% of the value of the remainder at time of death was to go to charity and 20% to contesting distributees, 80% of the remainder valued at time of distribution was to be distributed to the charity and 20% to the contesting distributees. This meant that the charity shared in increases after death in the value of the corpus. In this respect, the result was directly contrary to Seymour (supra).
The Court of Appeals realized that the result it would reach in Mayers depended upon whether the general legacy theory remained valid following enactment by the Legislature in 1929 of an amendment to section 17 of the Decedent Estate Law. The court expressly held that the general legacy theory was abrogated by the amendment. In referring to Matter of Apple (141 Misc 380), it said:
"Clearly Surrogate Foley, who had been chairman of the commission, felt that the general legacy theory had been abrogated entirely, for the charity was to receive all of the residue less the fixed amount of the excess at date of the testator’s death.
"It is obvious that the amendment of 1929 has done away with the theoretical transformation of an excessive gift to charity into a general legacy in a fixed amount. It is also clear that under either of the two rules evolved since 1929 the charity will receive eventually a gift whose value at the date of the testator’s death is either more (Matter of Buck, supra) or less (Matter of Miranda, supra) than one half the gross estate less debts. Apart from the anomalous consequences noted by the Surrogate which would result from the rule which appellants advocate, we cannot burke the fact that the charities would receive less than one half, when the statute commands that the charitable legacy shall be valid 'to the *723 extent of one-half, and no more.’ ” (Matter of Mayers, 299 NY 388, 397-398, supra.)
This same conclusion was again reached in Matter of Walsh (34 Misc 2d 388).
The ratable rule of Mayers was extended to a situation which did not involve an intervening life estate in Matter of Genna (69 Misc 2d 679). In dealing directly with a gift of the residue to charity, Surrogate Sobel wrote (p 681): "The preferred rule is the 'ratable’ rule of Matter of Mayers (189 Misc. 700, affd. 274 App. Div. 918, affd. 299 N. Y. 388). This rule should apply whether payment of the respective shares is 'postponed’ to let in an intervening estate or postponed solely for general administration purposes. It should be noted that the Mayers ratable rule was not required by statute — indeed it was applied contrary to statute because it was essentially fair. So, too, it should be applied here.”
Thus it appears that the law is flexible and subject to equitable principles in cases where there is an election against an excessive charitable bequest, coupled with a postponement of distribution, during which postponement a substantial change of value takes place. On the one hand, we have a noncharitable legatee in the case at bar (the widow) who received $250,000 plus the family brownstone residence and the contents thereof. The children are concerned that in electing to limit the charitable Foundation to one half under the ratable rule approach, as provided by EPTL 5-3.3 and the cases, their balance or share will be substantially reduced by the value of the said noncharitable bequest to the widow. If date-of-death values are used in determining the ratable percentage distribution as between the charity and the children, the children may suffer a substantial percentage loss, since the value of the $250,000 plus the brownstone residence plus the contents (which included 44 paintings of the artist) may constitute a substantial percentage of the entire estate. On the other hand, the charitable Foundation is similarly concerned that if date-of-death valuation is applied, its one half of this estate will fail to enjoy the substantial appreciation in value which the remaining 736 of the original 798 works (other than the widow’s 44) of the decedent artist enjoyed from date of death in 1970 until date of trial in 1974, and which they still enjoy to the present day, when sales of individual paintings are reported in excess of $200,000 per picture. These appreciated values may well be five or more times the values as of *724 date of death. Thus, if current date-of-distribution values are lost to the Foundation, any benefit to it from receiving a full one half of the estate as of date of death would be almost eliminated by the loss of appreciated value.
Since this is not a case where the will itself has caused the delay in distribution, as was the case in Matter of Mayers (189 Misc 700, affd 274 App Div 918, affd 299 NY 388, supra), and since the Foundation cannot be faulted for the delay caused by the conduct of the fiduciaries who have been removed, here would seem appropriate circumstances for the Foundation to "share in the increase caused in part by the use of its” property. (Matter of Seymour, 239 NY 259, 263, supra.) Indeed, if distribution had been made in kind shortly after the decedent’s death, as will probably be the major method of distribution in a short time, the Foundation would have enjoyed the appreciation in value of the paintings between 1970 and 1979.
We see no basis for favoring the argument of the children of the decedent in respect to their proportionate share being set at a full 50% of the estate assets on hand, after adding back estate taxes already paid and distributions made to beneficiaries. The statutory election is in derogation of the decedent’s intention to leave the bulk of his estate to the Foundation. To decrease the Foundation’s share below the statutory percentage of 50% of the estate assets at death less debts would be unfair and without basis under any of the cases discussed above.
Thus, the Foundation should receive the benefit of appreciation in the paintings as of current value. Its percentage share of the estate assets on hand would be, according to the ratable rule, equal to 50% of all estate assets as finally determined for Federal estate tax purposes (which in this case is, and in all cases probably should be, as of date of death) minus debts.
At this point we are faced with the problem of how to establish the manner of fixing the Foundation’s 50% share. There are two obstacles to an early disposition of this issue: (a) the bulk of the estate was and is in the form of hundreds of paintings rather than cash; and (b) Internal Revenue Service may not at an early time complete its final determination with respect to date-of-death estate taxes. The estate is presently resisting a deficiency assessment of large proportions. In litigating that issue there is not only a difference of opinion with respect to the value of the hundreds of paintings in this *725 estate but also whether a blockage discount should be given to the estate and whether a further discount should be available due to the inter vivos contract for an exclusive agency in favor of Marlborough Galleries for seven years after death, and finally whether a discount should be enjoyed by the estate for commissions which must be paid for selling many of the paintings by agents of the estate. On the latter problem there seems to be a conflict between the Court of Appeals for the Sixth Circuit (Matter of Park v Commissioner of Internal Revenue, 475 F2d 673), and the Court of Appeals for the Second Circuit (Matter of Smith v Commissioner of Internal Revenue, 57 USTC 650, affd 510 F2d 479, cert den 423 US 827), which may delay this matter until the Supreme Court of the United States may be asked to rule on this problem. For all of these reasons of delay, and because the Foundation is anxious to engage in meaningful charitable operations, all counsel have been authorized by their respective clients to agree that, for purposes of calculating the 50% share of the estate minus debts, which shall be retained by the Foundation, the following formulas shall be observed, which shall benefit this estate by avoiding litigation and controversy with respect to valuation and will avoid delay.
(a) The value of the preresiduary legacy given to the widow of the decedent, i.e., $250,000 plus the family brownstone residence plus 44 Rothko paintings as part of the contents of the family residence, is fixed for this purpose at one tenth of the entire estate minus debts, and the parties agree that this formula shall obtain at time of death and time of distribution. The result of this formula shall be that all distributions to the Foundation and the children, whether in cash or in kind, shall be divided four parts to the children and five parts to the Foundation.
(b) The above analysis with respect to the benefit for the Foundation in respect of sharing in the appreciation of values since date of death is now agreeable to all parties involved.
(c) Also agreeable to all parties here involved is the stipulation that the children and the Foundation shall bear all administration expenses, including the counsel fees and disbursements hereinafter set forth, and including all future counsel fees and disbursements, in the same ratio of four from the children’s shares and five from the Foundation’s share; thus, each of the two children shall contribute a proportion of two (aggregate four) and the Foundation of five.
*726 (d) All estate taxes paid or owing shall be borne entirely by the children in equal shares, inasmuch as the Foundation is exempt as a charitable foundation from estate taxation.
(e) All paintings, except those reasonably retained or sold by the administratrix, c. t. a., for purposes of meeting estate taxes and other administration expenses, shall be divided in kind at a reasonable time or times on or before December 31, 1979, by a method of rotational selection (by individual paintings) among the pictures, subject to calculating the pictures allegedly pledged to the Museum of Modern Art as part of the charitable allocation. Each of the three beneficiaries — the Foundation, the daughter, and the son of the decedent (by his general guardian) — may, with the help of any experts chosen by them respectively, divide and distribute in kind all pictures not necessary to be retained by the estate for expenses. The children may decide to keep their pictures in the estate for a reasonable time while earmarking them after the division, but the Foundation insists upon actual delivery to it, on or before December 31, 1979, of all of its pictures, subject to an agree-, ment not to compete with the estate as provided in paragraph (f) below.
The experts chosen by the three beneficiaries for purposes of division of this estate shall be compensated, if at all, by the respective beneficiaries. The Foundation will satisfy the estate with a reasonable refunding agreement in the event that it receives an overdistribution.
(f) During the three calendar years 1980,1981 and 1982, unless a final decree on accounting is sooner entered (whichever event occurs first), the Foundation agrees not to sell or give any of said pictures to any person or organization, nor to offer to sell or give any of said pictures to any person or organization, except for the. reasonable needs of its cash requirements, and then to sell only to or through the same gallery or art dealer designated by the administratrix, c. t. a., for the same purposes for the estate, said gallery being at this time the Pace Gallery in the County of New York.
(g) All reasonable adjustments will be made in respect of divisions of this estate in the ratio set forth above, and such adjustments are to be applied as though the estate still retains and includes estate taxes already paid, partial distributions already made, and legal fees heretofore paid to Butler, Jablow & Geller for the removal proceeding and to Breed, Abbott & Morgan for administration expenses, disbursements already *727 paid, other administrative expenses, and the like, the adjustments to reflect that such moneys are either in the estate or deemed to be in the estate for the purposes of the proportionate distribution of assets and sharing of expenses. Income taxes of the estate, since none are attributable to the Foundation, are chargeable to the children; refunds of income taxes, if any, accordingly belong to the children.
(h) No adjustment need be made, however, for the counsel fees stipulated to be paid within 10 days of this opinion, and such stipulation is set forth on the record made.
The estate assets on hand for said division purposes shall not include those legal fees incurred in preserving and adding to the estate’s assets. The reason for the exclusion of such legal fees is again an equitable resolution of a problem. This estate found itself involved in a lengthy litigation with the original executors and with art galleries contracting with them whose contracts have been set aside by this court’s decision in 1975. The benefits enjoyed by the estate which flowed from this litigation are substantial. All but 62 Rothko paintings of the 798 left by the decedent artist, have been recovered as requested by the administratrix c. t. a.; the balance of the value of the 62 lost paintings (valued by this court at $9,252,000 for 140 of the said 798 paintings as of 1974 and 1975) has been restored to the estate; an additional substantial sum of money in settlement of an action which the administratrix brought in the Federal court has been recovered by way of settlement, and the legal expense incurred in respect of such action has already been paid by the administratrix.
In order to accomplish these substantial benefits for the estate, the prevailing counsel have participated in approximately 20,000 pages of transcript of pretrial and trial testimony; thousands of exhibits have been introduced and considered; thousands of pages of briefs have been submitted to this court and to the appellate courts; many decisions were made in this court, pretrial as well as the ultimate disposition; the Appellate Division has ruled on these matters several times; and the Court of Appeals has finally unanimously affirmed the major disposition made in this court (43 NY2d 305).
The Official Reporter decisions involving this estate are voluminous and are as follows: Matter of Rothko (69 Misc 2d 752, affd 40 AD2d 1083; 71 Misc 2d 74, affd 43 AD2d 819; 71 Misc 2d 320, mod and affd 40 AD2d 965; 73 Misc 2d 548, revd 42 AD2d 558, mot for lv to app dsmd 33 NY2d 822; 41 AD2d *728 806; 42 AD2d 693; 77 Misc 2d 168, affd 47 AD2d 623, mot for lv to app den 36 NY2d 647; 80 Misc 2d 140; 84 Misc 2d 830, mod 56 AD2d 499, affd 43 NY2d 305; 56 AD2d 819; 95 Misc 2d 492).
There have also been numerous unofficially reported New York Law Journal decisions with respect to the estate.
These legal fees of the various prevailing counsel should be taken out of the assets of the estate in the first instance at the present time. The reason for this ruling is simply because the favorable results to this estate were obtained by counsel and the substantial well-being of this estate has been accomplished by the efforts of counsel. In short, a fund has been created not only of cash but of the bulk of assets in kind consisting of all but 62 paintings of 798 created by the decedent and part of his estate when he died. Again, it would seem equitable for counsel to be compensated out of the fund which they have created and preserved. (Dawson, Lawyers and Involuntary Clients: Attorneys Fees from Funds, 87 Harv L Rev 1597, 1647 et seq.) This shall be done before the division as between the children and the charitable Foundation. Since EPTL 5-3.3 provides that charitable foundations may be limited to one half of an estate minus debts, if so demanded by issue of the testator, the problem arises as to whether counsel fees incurred during an estate’s litigation can be considered "debts”. Actually, they are administration expenses, not debts, but having created this fund and benefit for the estate, it would appear that counsel should be paid from the benefits with which they have enhanced the estate, before the children and the charitable Foundation shall receive their proportionate shares. This would appear to be a proper approach even if no agreement were achievable among the parties.
The request by counsel for fees for services in the proceeding to remove the original executors, to set aside the contracts those executors made with the galleries, to eliminate the rights of the galleries with respect to inter vivos contracts with the artist, to restore hundreds of paintings to the estate, to compensate the estate for paintings not returnable to it to the extent of millions of dollars (hereinafter referred to as the removal proceeding), to litigate the rights of election by the children against an excessive charitable distribution (hereinafter called the election proceeding), to construe the will of the decedent Mark Rothko as to the meaning of the "contents” of the family residence which was given to his widow and to her *729 estate, later by the widow’s will to testator’s children (hereinafter called the contents proceeding), have involved many counsel with lengthy professional services, some of them over a period from 1971 to 1979. Prevailing counsel have substantiated their many years of labor in preparation and trial and appeals and have requested sums largely in excess of what has finally been agreed upon as a reasonable compromise. In approving the various fees, the court has had the benefit of lengthy affidavits, memoranda, letters, and many conferences with counsel. The Attorney-General has been represented at such conferences and has opposed the fees herein approved to the extent considered by that office to be excessive. However, in view of the agreement of all other parties to the fees set forth herein, which were urged and approved by the court as a reasonable basis for settlement, and because the over-all disposition herein and agreement to waive appeal with respect to all of the issues will permit a prompt disposition, without further litigation expense, of the art assets of the estate after a nine-year delay, the Attorney-General has decided not to interpose an objection. Indeed, the parties other than the Attorney-General have differed with one another as to the value of their respective services. Taking all these considerations into account and adding to it the court’s own observation of these lengthy proceedings, the unusually successful results obtained, the risk of difficulty in enforcing recovery, the high professional standing of the attorneys, the long delay in compensation, and the difficult and preoccupying litigation spanning not only a number of years but involving litigation in the United States and Canada, in the Surrogate’s Court and in the appellate courts of New York, involving facts concerning operations conducted in Italy, Great Britain, Switzerland, Liechtenstein, Hong Kong, France and Portugal, the court is of the opinion that the fees finally agreed upon are fair and equitable and indeed reasonable and necessary as a charge upon the estate of Mark Rothko, whether or not any of these fees are recovered or should be recovered from the removed executors. (Cf. Matter of Potts, 213 App Div 59, affd 241 NY 593; Matter of Freeman, 34 NY2d 1, Matter of Snell, 17 AD2d 490.) It should be emphasized that the value of this estate has been enhanced to approximately $40,000,000, which, as indicated above, includes recovered paintings appreciated in value to the estate by five or more times the value which the estate would have enjoyed absent such litigation. Even though the estate’s paintings would have appreciated substantially with *730 out regard to the removal litigation, the increment would have inured substantially to the benefit of the former galleries rather than, as a result of that litigation, to the benefit of the estate. Those fees for services as above set forth, other than estate administration, are as follows.
a. Breed, Abbott & Morgan for all services in connection with the removal, contents and election proceedings: $2,600,-000 less $500,000 already paid (reduced from $7,500,000 requested). Efforts since the Court of Appeals affirmance (43 NY2d 305), to the extent that such efforts were not included in time charges already presented, may be the subject of administration charges.
b. Hall, Dickler, Lawler, Kent & Howley for all services in connection with the removal, contents, and election proceedings: $450,000 (reduced from $900,000 requested) plus disbursements requested. No further services for and thus no further fees from this estate are contemplated for this firm in connection with the above proceedings.
c. Butler, Jablow & Geller for all services in connection with construction of the will of Mark Rothko in the contents proceeding: $85,000 (reduced from $150,000 requested) plus disbursements requested. No further services for and thus no further fees from this estate are contemplated for this firm. This is in full payment to the said firm in the said proceeding due from any source.
d. Cleary, Gottlieb, Steen & Hamilton for all services for the appeals in the removal proceeding: $65,000 (reduced from $85,000) plus unpaid disbursements requested. No further fees from this estate are contemplated for this firm with respect to the above-described proceedings.
The fees and disbursements set forth above in paragraphs a, b, c, and d shall be paid within 10 days, unless further time is allowed by the court. The liquid assets on hand in the estate will cover these fees and disbursements.
In all of these activities of counsel, the court is aware that prevailing counsel have done a remarkably effective and highly skilled professional service to this estate and for their respective clients. The court wishes to express its appreciation for such outstanding professional accomplishments on the part of Breed, Abbott & Morgan and the lawyers who participated from that firm (Edward J. Ross and his colleagues); Hall, Dickler, Lawler, Kent & Howley and the attorneys who participated from that firm (Gerald Dickler and his colleagues); *731 Cleary, Gottlieb, Steen & Hamilton and its participating attorneys (George E. De Sipio and his colleagues); Butler, Jablow & Geller (Stanley Geller and his colleauges), who participated in the pretrial motions which succeeded, although the appeals therefrom were handled by Breed, Abbott & Morgan as substituted counsel; and also by the several Assistant Attorneys-General (Gustave Harrow and his colleagues, whose efforts exceeded the call of duty). All counsel served in the best traditions of the law and are complimented for their skill, their professional persistence, and the high standards of their ethical conduct. By complimenting prevailing counsel, no less can be said of Canadian counsel who assisted there, nor of all counsel who opposed but did not prevail, nor of Patterson, Belknap, Webb & Tyler (Harold R. Tyler, Jr., and his colleagues) who assisted the administratrix in respect of fees fixed herein.
Concerning this decision, which has been approved by all counsel involved in this aspect, and authorized by the administratrix and all parties who are beneficiaries of the estate, all such parties and the Attorney-General further waive any appeal from this decision and adopt it as a stipulation of settlement of the matters encompassed therein after considerable controversy, knowing that the court has approved the same. Largely because of the approval of the court, the publication of this opinion is indicated, even though the parties concur. Such approval is required, based as it is upon the court’s view as to the fairness of the entire decision and because this decision comports with correct principles of law.